## ILLINOIS *v.* ANDREAS

No. 81–1843.   Argued March 30, 1983—Decided July 5, 1983

*Richard A. Devine* argued the cause for petitioner. With him on the briefs were *Neil F. Hartigan*, Attorney General of Illinois, *Tyrone C. Fahner*, former Attorney General, *Michael A. Ficaro*, Assistant Attorney General, *Daniel Harris*, Special Assistant Attorney General, *Michael E. Shabat*, and *Joan S. Cherry*.

*Patrick G. Reardon* argued the cause for respondent. With him on the brief was *Lawrence J. Suffredin, Jr.*\*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented is whether a warrant was required to reopen a sealed container in which contraband drugs had been discovered in an earlier lawful border search, when the container was seized by the police after it had been delivered to respondent under police supervision.

---

\**Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey, Carolyn F. Corwin,* and *Mervyn Hamburg* filed a brief for the United States as *amicus curiae* urging reversal.

I

A large, locked metal container was shipped by air from Calcutta to respondent in Chicago. When the container arrived at O'Hare International Airport, a customs inspector opened it and found a wooden table approximately three feet in diameter and 8 to 10 inches thick. Marihuana was found concealed inside the table.

The customs inspector informed the Drug Enforcement Administration of these facts and Special Agent Labek came to the airport later that day. Labek chemically tested the substance contained in the table, confirming that it was marihuana. The table and the container were resealed.

The next day, Labek put the container in a delivery van and drove to respondent's building. He was met there by Chicago Police Inspector Lipsek. Posing as delivery men, Labek and Lipsek entered the apartment building and announced they had a package for respondent. Respondent came to the lobby and identified himself. In response to Lipsek's comment about the weight of the package, respondent answered that it "wasn't that heavy; that he had packaged it himself, that it only contained a table." App. 14.

At respondent's request, the officers making the delivery left the container in the hallway outside respondent's apartment. Labek stationed himself to keep the container in sight and observed respondent pull the container into his apartment. When Lipsek left to secure a warrant to enter and search respondent's apartment, Labek maintained surveillance of the apartment; he saw respondent leave his apartment, walk to the end of the corridor, look out the window, and then return to the apartment. Labek remained in the building but did not keep the apartment door under constant surveillance.

Between 30 and 45 minutes after the delivery, but before Lipsek could return with a warrant, respondent reemerged from the apartment with the shipping container and was immediately arrested by Labek and taken to the police station. There, the officers reopened the container and seized the

marihuana found inside the table. No search warrant had been obtained.

Respondent was charged with two counts of possession of controlled substances. Ill. Rev. Stat., ch. 56 ½, ¶¶ 704(e) and 705(e) (1981). Prior to trial, the trial court granted respondent's motion to suppress the marihuana found in the table, relying on *Arkansas* v. *Sanders*, 442 U. S. 753 (1979), and *United States* v. *Chadwick*, 433 U. S. 1 (1977).

On appeal, the Appellate Court of Illinois, First Judicial District, affirmed. 100 Ill. App. 3d 396, 426 N. E. 2d 1078 (1981). It relied primarily on *Sanders* and *Chadwick* in holding that respondent had a legitimate expectation of privacy in the contents of the shipping container. 100 Ill. App. 3d, at 399–401, 426 N. E. 2d, at 1080–1082. It recognized that no warrant would be necessary if the police had made a "controlled delivery" of the container following a lawful search, but held that here the police had failed to make a "controlled delivery."

A "controlled delivery," in the view of the Illinois court, requires that the police maintain "dominion and control" over the container at all times; only by constant control, in that court's view, can police be "absolutely sure" that its contents have not changed since the initial search. *Id.*, at 402, 426 N. E. 2d, at 1082. Here, according to the court, the police could not have been "absolutely sure" of the container's contents for two reasons: (1) Labek was not present when the container was resealed by the customs officers, and thus he knew of its contents only by "hearsay," *ibid.*, 426 N. E. 2d, at 1083, and (2) the container was out of sight for the 30 to 45 minutes while it was in respondent's apartment; thus, in the court's view, "there is no certainty that the contents of the package were the same before and after the package was brought into [respondent's] apartment." *Ibid.* Accordingly, the Illinois court held that the warrantless reopening of the container violated the Fourth Amendment.

We granted certiorari, 459 U. S. 904 (1982), and we reverse.

## II

The lawful discovery by common carriers or customs officers of contraband in transit[1] presents law enforcement authorities[2] with an opportunity to identify and prosecute the person or persons responsible for the movement of the contraband. To accomplish this, the police, rather than simply seizing the contraband and destroying it, make a so-called controlled delivery of the container to its consignee, allowing the container to continue its journey to the destination contemplated by the parties. The person dealing in the contraband can then be identified upon taking possession of and asserting dominion over the container.[3]

---

[1] Common carriers have a common-law right to inspect packages they accept for shipment, based on their duty to refrain from carrying contraband. See *United States* v. *Pryba*, 163 U. S. App. D. C. 389, 397–398, 502 F. 2d 391, 399–400 (1974). Although sheer volume prevents systematic inspection of all or even a large percentage of the cargo in their care, see, *e. g.*, *McConnell* v. *State*, 595 P. 2d 147, 148, and n. 1 (Alaska 1979), carriers do discover contraband in a variety of circumstances. Similarly, although the United States Government has the undoubted right to inspect all incoming goods at a port of entry, see *United States* v. *Ramsey*, 431 U. S. 606, 616–619 (1977), it would be impossible for customs officers to inspect every package. In the course of selective inspections, they inevitably discover contraband in transit.

[2] When common carriers discover contraband in packages entrusted to their care, it is routine for them to notify the appropriate authorities. The arrival of police on the scene to confirm the presence of contraband and to determine what to do with it does not convert the private search by the carrier into a government search subject to the Fourth Amendment. *E. g.*, *United States* v. *Edwards*, 602 F. 2d 458 (CA1 1979).

[3] Of course, the mere fact that the consignee takes possession of the container would not alone establish guilt of illegal possession or importation of contraband. The recipient of the package would be free to offer evidence that the nature of the contents were unknown to him; the nature of the contents and the recipient's awareness of them would be issues for the factfinder.

The typical pattern of a controlled delivery was well described by one court:

> "Controlled deliveries of contraband apparently serve a useful function in law enforcement. They most ordinarily occur when a carrier, usually an airline, unexpectedly discovers what seems to be contraband while inspecting luggage to learn the identity of its owner, or when the contraband falls out of a broken or damaged piece of luggage, or when the carrier exercises its inspection privilege because some suspicious circumstance has caused it concern that it may unwittingly be transporting contraband. Frequently, after such a discovery, law enforcement agents restore the contraband to its container, then close or reseal the container, and authorize the carrier to deliver the container to its owner. When the owner appears to take delivery he is arrested and the container with the contraband is seized and then searched a second time for the contraband known to be there." *United States* v. *Bulgier*, 618 F. 2d 472, 476 (CA7), cert. denied, 449 U. S. 843 (1980).

See also *McConnell* v. *State*, 595 P. 2d 147 (Alaska 1979).

Here, a customs agent lawfully discovered drugs concealed in a container and notified the appropriate law enforcement authorities. They took steps to arrange delivery of the container to respondent. A short time after delivering the container, the officers arrested respondent and reseized the container.[4] Respondent claims, and the Illinois court held, that the warrantless reopening of the container following its reseizure violated respondent's right under the Fourth Amendment "to be secure . . . against unreasonable searches and seizures . . . ." We disagree.

---

[4] Respondent has not claimed that the warrantless seizure of the container from the hallway of his apartment house following his arrest violated the Fourth Amendment; his claim goes only to the warrantless reopening of the container.

The Fourth Amendment protects legitimate expectations of privacy rather than simply places. If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no "search" subject to the Warrant Clause. See *Walter* v. *United States*, 447 U. S. 649, 663–665 (1980) (BLACKMUN, J., dissenting). The threshold question, then, is whether an individual has a legitimate expectation of privacy in the contents of a previously lawfully searched container. It is obvious that the privacy interest in the contents of a container diminishes with respect to a container that law enforcement authorities have already lawfully opened and found to contain illicit drugs. No protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal. The simple act of resealing the container to enable the police to make a controlled delivery does not operate to revive or restore the lawfully invaded privacy rights.

This conclusion is supported by the reasoning underlying the "plain-view" doctrine. The plain-view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity. *Texas* v. *Brown*, 460 U. S. 730, 738, and n. 4, 741–742 (1983) (plurality opinion); *id.*, at 746 (POWELL, J., concurring in judgment); *id.*, at 748, 749–750 (STEVENS, J., concurring in judgment). The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item firsthand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy. That rationale applies here; once a container has been found to a certainty to contain illicit drugs,[5] the contra-

_____

[5] The Illinois Court held that Labek's absence when the container was resealed by customs officers somehow made less than certain his knowledge of the container's contents. This was plain error: where law enforcement authorities are cooperating in an investigation, as here, the knowl-

band becomes like objects physically within the plain view of the police, and the claim to privacy is lost. Consequently, the subsequent reopening of the container is not a "search" within the intendment of the Fourth Amendment.

However, the rigors and contingencies inescapable in an investigation into illicit drug traffic often make "perfect" controlled deliveries and the "absolute certainty" demanded by the Illinois court impossible to attain. Conducting such a surveillance undetected is likely to render it virtually impossible for police so perfectly to time their movements as to avoid detection and also be able to arrest the owner and reseize the container the instant he takes possession. Not infrequently, police may lose sight of the container they are trailing, as is the risk in the pursuit of a car or vessel.

During such a gap in surveillance, it is possible that the container will be put to other uses—for example, the contraband may be removed or other items may be placed inside. The likelihood that this will happen depends on all the facts and circumstances, including the nature and uses of the container, the length of the break in surveillance, and the setting in which the events occur. However, the mere fact that the police may be less than 100% certain of the contents of the container is insufficient to create a protected interest in the privacy of the container. See *Arkansas* v. *Sanders,* 442 U. S., at 764–765, n. 13. The issue then becomes at what point after an interruption of control or surveillance, courts should recognize the individual's expectation of privacy in the container as a legitimate right protected by the Fourth Amendment proscription against unreasonable searches.

In fashioning a standard, we must be mindful of three Fourth Amendment principles. First, the standard should be workable for application by rank-and-file, trained police officers. See *New York* v. *Belton,* 453 U. S. 454, 458–460 (1981); *United States* v. *Ross,* 456 U. S. 798, 821 (1982).

---

edge of one is presumed shared by all. See *Whiteley* v. *Warden,* 401 U. S. 560, 568 (1971).

Second, it should be reasonable; for example, it would be absurd to recognize as legitimate an expectation of privacy where there is only a minimal probability that the contents of a particular container had been changed. Third, the standard should be objective, not dependent on the belief of individual police officers. See *Terry* v. *Ohio*, 392 U. S. 1, 21–22 (1968). A workable, objective standard that limits the risk of intrusion on legitimate privacy interests is whether there is a substantial likelihood that the contents of the container have been changed during the gap in surveillance. We hold that absent a substantial likelihood that the contents have been changed, there is no legitimate expectation of privacy in the contents of a container previously opened under lawful authority.

## III

Applying these principles, we conclude there was no substantial likelihood here that the contents of the shipping container were changed during the brief period that it was out of sight of the surveilling officer. The unusual size of the container, its specialized purpose, and the relatively short break in surveillance combine to make it substantially unlikely that the respondent removed the table or placed new items inside the container while it was in his apartment. Thus, reopening the container did not intrude on any legitimate expectation of privacy and did not violate the Fourth Amendment.

The judgment of the Illinois Appellate Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

The underlying question in this case is very simple: whether a second search after a prior legal search and a "controlled delivery" will ordinarily require a warrant. The Court answers that question by announcing that the second search is not a search at all, but merely a "reopening," *ante,*

at 772, not subject to the protection of the Fourth Amendment. I suppose one should be grateful that the Court has not explicitly opened one more breach in the general rule that "'"searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."'" *United States* v. *Ross,* 456 U. S. 798, 825 (1982), quoting *Mincey* v. *Arizona,* 437 U. S. 385, 390 (1978), in turn quoting *Katz* v. *United States,* 389 U. S. 347, 357 (1967).[1] On the other hand, the Court's rationale, even though limited to a very specific fact pattern, is nevertheless astounding in its implications. We have, to my knowledge, never held that the physical opening and examination of a container in the possession of an individual was anything other than a "search." It might be a permissible search or an impermissible search, require a warrant or not require a warrant, but it is in any event a "search."[2]

## I

### A

The Court's primary argument in favor of its "no-search" holding can be stated briefly:

> "The threshold question . . . is whether an individual has
> a legitimate expectation of privacy in the contents of a

---

[1] See also, *e. g., Arkansas* v. *Sanders,* 442 U. S. 753, 759 (1979); *G. M. Leasing Corp.* v. *United States,* 429 U. S. 338, 358 (1977); *United States* v. *United States District Court,* 407 U. S. 297, 318 (1972); *Camara* v. *Municipal Court,* 387 U. S. 523, 528–529 (1967); *Jones* v. *United States,* 357 U. S. 493, 499 (1958).

[2] Indeed, if the "reopening" of a package in a controlled delivery context is not a "search," it is not even clear why it should *require* probable cause. Fortunately, though, the Court seems to reject this implication of its reasoning. See *ante,* at 771 ("No protected privacy interest remains in contraband in a container once government officials lawfully have opened that container and identified its contents as illegal"); *ante,* at 771–772 ("once a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost") (footnote omitted).

previously lawfully searched container. It is obvious that the privacy interest in the contents of a container diminishes with respect to a container that law enforcement authorities have already lawfully opened and found to contain illicit drugs. No protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal. The simple act of sealing the container to enable the police to make a controlled delivery does not operate to revive or restore the lawfully invaded privacy rights." *Ante*, at 771.

The validity of this reasoning depends, however, on what the Court means by "protected privacy interest." Clearly, one aspect of the privacy interest protected by the Fourth Amendment is the right to keep certain *information* beyond official scrutiny. See *United States* v. *Knotts*, 460 U. S. 276, 281–282 (1983) (no reasonable expectation of privacy in location of automobile on public roads). If this were all that were meant by the notion of privacy embodied in the Fourth Amendment, the Court's analysis would be essentially correct. Respondent knowingly and voluntarily rendered his container vulnerable to a perfectly legal and perfectly proper border search. And as soon as that search revealed the presence of contraband, any reasonable expectation respondent may have had that the existence of the contraband would remain secret was lost, and could not be regained.

The Fourth Amendment, however, does not protect *only* information. It also protects, in its own sometimes-forgotten words, "[t]he right of the people *to be secure* in their persons, houses, papers, and effects . . ." (emphasis added). As Justice Brandeis put the matter in his dissent in *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928), the Fourth Amendment "conferred, as against the Government, the *right to be let alone*—the most comprehensive of rights and the right most valued by civilized men" (emphasis added). The right to be "let alone" is, at the very least, the right not to have one's repose and possessions disturbed. See, *e. g.*, *Rakas* v.

*Illinois*, 439 U. S. 128 (1978); *United States* v. *United States District Court*, 407 U. S. 297, 326–327 (1972) (Douglas, J., concurring); *Alderman* v. *United States*, 394 U. S. 165, 179–180 (1969); *Silverman* v. *United States*, 365 U. S. 505, 511–512 (1961); *Taylor* v. *United States*, 286 U. S. 1 (1932); *Boyd* v. *United States*, 116 U. S. 616, 626–630 (1886).[3] In this case, respondent had the right to maintain the integrity of his container. Admittedly, he waived that right temporarily when the container passed through customs inspection; as *Carroll* v. *United States*, 267 U. S. 132 (1925), teaches us, the right of the Government to search, with or without probable cause, persons and property entering the country is necessary to "national self protection." *Id.*, at 154. But however justified the search at customs may have been, that justification no longer existed once the container was sent on its way, and certainly did not exist once the container was delivered to respondent.

That the Court's reduction of the right to privacy to the right to secrecy is incorrect, and that its implicit analogy between a border search and a loss of amateur status is inapt, is made quite clear by a number of our recent cases.[4] In *Lo-Ji*

---

[3] See generally Posner, The Uncertain Protection of Privacy by the Supreme Court, 1979 S. Ct. Rev. 173 (discussing "seclusion" and "secrecy" aspects of privacy right protected by the Fourth Amendment); cf. *Whalen* v. *Roe*, 429 U. S. 589, 599, nn. 24–25 (1977).

[4] The Court's confusion may be in part an unintended consequence of our decision in *Katz* v. *United States*, 389 U. S. 347 (1967), where we held that electronic eavesdropping was subject to the warrant requirement even if it involved no physical intrusion into a suspect's "protected area." Before *Katz*, this Court may have focused too much on the "security" aspect of the right of privacy, while giving short shrift to its "secrecy" aspect. In recognizing the importance of secrecy, however, *Katz* did not extinguish the relevance of security. As I wrote only recently, *Katz* "made quite clear that the Fourth Amendment protects against governmental invasions of a person's reasonable 'expectation[s] of privacy,' even when those invasions are not accompanied by physical intrusions. Cases such as *Silverman* v. *United States*, 365 U. S. 505, 509–512 (1961), how-

*Sales, Inc.* v. *New York,* 442 U. S. 319 (1979), for example, we reviewed the warrantless search of an "adult bookstore" by local law enforcement officials. THE CHIEF JUSTICE, speaking for a unanimous Court, stated:

> "The suggestion is [made] that by virtue of its display of the items at issue to the general public in areas of its store open to them, petitioner had no legitimate expectation of privacy against governmental intrusion, see *Rakas* v. *Illinois,* 439 U. S. 128 (1978), and that accordingly no warrant was needed. But there is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees. See *Lewis* v. *United States,* 385 U. S. 206, 211 (1966)." *Id.,* at 329.

Cf. *Walter* v. *United States,* 447 U. S. 649, 660–662 (1980) (WHITE, J., concurring in judgment). Similarly, in *Michigan* v. *Tyler,* 436 U. S. 499 (1978), we held that, although a building fire and its immediate aftermath are "exigent circumstances" justifying the warrantless entry of the building both by firefighters and by investigators, any further intrusions that take place after the exigent circumstances have passed require a warrant. The fire may suspend the right to be let alone, but it does not extinguish it, and an initial search does not validate the legality of subsequent independent warrantless searches, let alone render them nonsearches. Cf. *G. M. Leasing Corp.* v. *United States,* 429 U. S. 338, 358–359 (1977).

---

ever, hold that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment even if the same information could have been obtained by other means. I do not believe that *Katz,* or its progeny, have eroded that principle." *United States* v. *Knotts,* 460 U. S. 276, 286 (1983) (BRENNAN, J., concurring in judgment).

Thus, in its analysis today, the Court breaks new ground and erodes the principles of the Fourth Amendment. Moreover, by claiming that the right to "title and possession" confers no right to "privacy," *ante*, at 771, the Court adopts a view curiously out of touch with the genius of the American system of liberties.

### B

The Court supports its "no-search" analysis by an analogy to the "reasoning underlying the 'plain-view' doctrine." *Ibid.* In fact, however, the "plain-view" doctrine hurts rather than helps the Court's case, for it recognizes and indeed emphasizes that the Fourth Amendment protects *security* as well as *secrecy.*

> "We recognized in *Payton* v. *New York*, 445 U. S. 573, 587 (1980), the well-settled rule that 'objects such as weapons or contraband found in a public place may be seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.' A different situation is presented, however, when the property in open view is 'situated on private premises to which access is not otherwise available for the seizing officer.' *Ibid.*, quoting *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 354 (1977). As these cases indicate, 'plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment. 'Plain view' is perhaps better understood, therefore, not as an independent 'exception' to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *Texas* v. *Brown*, 460 U. S. 730, 738–739 (1983) (opinion of REHNQUIST, J.) (footnote omitted).

See also *id.*, at 747–749 (STEVENS, J., concurring in judgment); *Coolidge* v. *New Hampshire*, 403 U. S. 443, 464–471 (1971)

(plurality opinion). Thus, under the "plain-view" doctrine, the fact that a person displays incriminating evidence in his living room window[5] (or allows it to pass through customs inspection) is *not* enough by itself to authorize a search and seizure of that evidence. More is necessary, and that "more" must be some *independent* reason for breaching the individual's right to repose and to security in his possessions. Moreover, as the Court itself admits, "plain view" can only justify a search or seizure of an item if the authorities have "probable cause to suspect that the item is connected with criminal activity." *Ante*, at 771. Obviously, there would be no need to require probable cause if the protections of the Fourth Amendment did not apply at all to the search or seizure in question. Cf. n. 2, *supra*.

## C

The plain-view doctrine does, of course, highlight the fact that there are certain "specifically established and well-delineated exceptions" to the Fourth Amendment's warrant requirement. See *supra*, at 774. Such exceptions, however, require at the very least that there be some compelling government interest at stake, not merely in the search at issue, but in the right to conduct the search *without a warrant.*[6] Moreover, we have repeatedly made clear that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry* v. *Ohio*, 392 U. S. 1, 20 (1968). See *United States* v. *Chadwick*, 433 U. S. 1, 13 (1977); *United States* v. *United States District Court*, 407 U. S., at 315–318; *Chimel* v. *California*, 395 U. S. 752, 762 (1969); *Johnson* v. *United*

---

[5] Cf. *Coolidge* v. *New Hampshire*, 403 U. S., at 468, and n. 25 (plurality opinion); *Taylor* v. *United States*, 286 U. S. 1 (1932).

[6] "In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant . . . ." *Camara* v. *Municipal Court*, 387 U. S., at 533.

*States*, 333 U. S. 10, 15 (1948); *Carroll* v. *United States*, 267 U. S., at 153. Indeed, each of the limited exceptions we have established to the warrant requirement arose in a context in which, at the very least, a warrantless search was necessary to preserve the safety of law enforcement officers, see, *e. g.*, *Chimel* v. *California, supra* (search incident to arrest), or to prevent the loss or destruction of evidence, see, *e. g.*, *Chambers* v. *Maroney*, 399 U. S. 42, 48–51 (1970) (automobile exception), or in which the very special nature of the government interest made it appropriate to allow a search based on something less than probable cause, see, *e. g.*, *Carroll* v. *United States, supra*, at 154 (border search). In the plain-view context, the compelling government interest is evident: the legal search has already put potential suspects on notice that they are the objects of official interest; the delay inherent in obtaining a warrant at that point might risk the destruction of the evidence and even the security of the officers. See *Coolidge, supra*, at 467–468 (plurality opinion). This case, however, presents none of the conditions that we have previously held indispensable to the recognition of an exception to the warrant requirement. The police officers who conducted the search of respondent's container could have obtained, were indeed in the process of obtaining, a search warrant, but decided instead—for no apparent reason other than the hope of vindication in this Court—to conduct the search without a warrant. Thus, even if one were to recharacterize the Court's novel "no-search" analysis as simply another exception to the warrant requirement, it would be difficult to square that result with the clear mandate of our previous decisions.

I agree entirely with the Court that "controlled delivery" is a proper and effective tool of responsible law enforcement. See *ante*, at 769–770. If contraband is discovered in a package passing through customs inspection, the authorities are not required to seize it then and there, but may make use of their discovery to obtain more evidence and to capture the culprits behind the contraband. The "controlled delivery" tech-

nique, however, would be just as effective, and decidedly more proper, if the second search that came at its culmination were authorized by a valid search warrant. Under these circumstances, I am not at all sure what interest the Court thinks it is vindicating by its determined if awkward exertions.

## II

Even if the Court were correct that the "reopening" of a package after a properly controlled "controlled delivery" is not a "search," I could still not agree with the standard it fashions to put that principle into effect, or with the result it reaches in this case. The Court holds that a "reopening" is not a "search" as long as there is not a "substantial likelihood that the contents of the container have been changed during [a] gap in surveillance." *Ante*, at 773. Of course, "the rigors and contingencies inescapable in an investigation into illicit drug traffic often make 'perfect' controlled deliveries and . . . 'absolute certainty' . . . impossible," *ante*, at 772. Nevertheless, the very justifications proffered by the Court for its "no-search" analysis should have at least led it to require something very close to "absolute certainty." Cf. *post*, p. 782 (STEVENS, J., dissenting). After all, if a person has no reasonable expectation of privacy in a package whose contents are already legally known to the authorities, a reasonable expectation of privacy should reattach if the person has unobserved access to the package and any opportunity to change its contents. By adopting a vague intermediate standard, the Court makes more likely serious intrusions into what even it would consider to be "reasonable expectations of privacy." Moreover, I cannot see how as indistinct a phrase as "substantial likelihood" could in any way serve the Court's interest in fashioning a standard "workable for application by rank-and-file, trained police officers." *Ante*, at 772.

In this case, the package subject to a "controlled delivery" was in respondent's possession for between 30 and 45 minutes. For a good deal of that time, it was unobserved. I am by no means convinced that there was, as an *ex ante* matter,

even a "substantial likelihood" that the container still contained contraband when it was searched, or "reopened." In any event, I fail to see how, in light of the very justifications put forward by the Court for a "controlled delivery" gloss on the Fourth Amendment, a warrantless search can be justified here as in any way consistent with the principles embodied in that Amendment.

I dissent.

JUSTICE STEVENS, dissenting.

The issue in this case is remarkably similar to the controlling issue in *Texas* v. *Brown*, 460 U. S. 730 (1983): Was there "virtual certainty" that the police would find contraband inside an unusual container that they had lawfully seized? The unique character of the balloon in *Brown*, like the unique character of the metal case enclosing a table that in turn had been designed to conceal drugs, combined with other circumstantial evidence, provided powerful evidentiary support for the conclusion that contraband was inside the container. In this case, as in *Brown*, I believe the "absolute certainty" test applied by the state court was somewhat more strict than is required by the Fourth Amendment to the United States Constitution. I would therefore vacate the judgment of the Illinois Appellate Court and remand for further proceedings.*

---

*If I were sitting as a trial judge, and actually had heard the evidence, I believe I would have found that there was virtual certainty that the police officers were correct in both cases. But, unlike my colleagues, I do not believe it is this Court's province to make such factual determinations. See *United States* v. *Hasting*, 461 U. S. 499, 516–517 (1983) (STEVENS, J., concurring in judgment); *First National City Bank* v. *Banco para el Comercio Exterior de Cuba*, 462 U. S. 611, 636 (1983) (STEVENS, J., concurring in part and dissenting in part).