STATE of Alaska, Petitioner,

v.

Alephe MORRIS and Sudie Burnham, Respondents.

No. 7280.

Court of Appeals of Alaska.

Sept. 2, 1983.

---

Patrick J. Gullufsen, Dist. Atty., and Wilson L. Condon, Atty. Gen., Juneau, for petitioner.

Douglas Pope, Anchorage, for respondent Morris.

William T. Council, Juneau, for respondent Burnham.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Alephe Morris and Sudie Burnham were arrested and charged with possession of cocaine. They moved to suppress the cocaine seized at the time of their arrest on three independent grounds. An evidentiary hearing was held on June 28, 1982, before Superior Court Judge Thomas E. Schulz. Judge Schulz granted the motion by written memorandum of decision and order, dated October 22, 1982. The state petitioned for review, which this court granted on January 12, 1983.

For purposes of the petition for review the state has adopted the detailed outline of facts contained in the trial court's order, which in turn was derived from a stipulation between the parties and the testimony at the suppression hearing. Morris and Burnham accept the statement of facts, but cite in addition testimony given at the evidentiary hearing. We have accepted the

additional facts which have been referred to by Morris and Burnham as true for purposes of reviewing this petition.

## FACTS

We have set out Judge Schulz' decision, including footnotes, hereafter:

Early in the day of April 8, 1982, an Alaska Airlines employee named De Alesandro received a "goldstreak" package addressed to Alephe Morris, the Alaska State Legislature, Pouch 5, Juneau, Alaska 99811. The goldstreak label also had a phone number for Alaska Airlines to call upon arrival of the package in Juneau. That number was 465–5766, the telephone number for an office of the State Legislature by whom Alephe Morris was employed.

De Alesandro, on his own and for purely airline reasons, x-rayed the package to determine that it contained "only papers" as was represented. The x-ray machine disclosed that the package contained something other than papers, something that De Alesandro thought could possibly be drugs, and he notified Agent Paul Wallace of the Drug Enforcement Administration. Agent Wallace came to the Alaska Airline counter and took the package to a D.E.A. office. He did not open it and he did not x-ray it but he did arrange ... [for] a "sniff" by a dog trained to "alert" on certain drugs or narcotics. The dog "Ryker" had a history of successful alerts on packages containing drugs[1] and he alerted on the package addressed to Ms. Morris. Wallace returned the package to Alaska Airlines, unopened and otherwise uninspected and it was thereafter shipped to Ms. Morris on Flight 62 from San Francisco to Seattle and on Flight 69 from Seattle to Juneau, arriving in [the] evening hours of April 8, 1982.

In the meantime, Agent Wallace contacted the Alaska State Troopers and after he verified that Wallace was who he said he was, Sgt. Glass of the troopers called Wallace back and obtained information which formed the basis for a search warrant[2] issued by District Court Judge Gerald Williams.

After obtaining the warrant, Sgt. Glass, Lt. Roger McCoy, Alaska State Troopers, and Officer Nancy Peterson of the Division of Fish and Wildlife Protection went to the terminal building at the Juneau Airport to observe who picked up the goldstreak package and to establish surveillance so that the package and whoever picked it up could be followed to wherever the package was taken.[3] There were other law enforcement personnel located in vehicles at strategic points along exit routes from the airport complex and there was radio communication between all officers involved.

About 11:00 p.m. defendants approached the Alaska Airline goldstreak counter and Ms. Morris inquired about the package.[4] It was some twenty minutes to one-half hour before airlines personnel were able to deliver the package to Ms. Morris, and during this period of time, Officer Peterson moved toward a public telephone in order to observe the two women from a better angle. At the time she picked up the telephone, Officer Peterson recognized Mrs. Burnham, a friend of hers and the two women greeted one another with a hug. Officer Peterson was introduced to Alephe Morris. During a brief conversation, Officer Peterson invited

---

1. The testimony indicates that "Ryker" had located drugs in various packages or containers over 400 times.

2. I do not believe it is necessary, for a disposition of the pending motions, to set out the testimony taken by Judge Williams. It suffices to say that the testimony established probable cause for issuance of the search warrant.

3. After a recitation of the probable cause finding, the warrant provided:
   You are therefore commanded in the evening, after the arrival of Fl. 69 on 4/8/82 to make search on the person of: (4) Alephe Morris or whoever picks up said package or the premises situated at: (5) wherever the described package is taken to (and you may enter and search for said package upon having followed it to the place into which it is taken and you may open said package and identify and seize its contents for the following property: The above described package ...

4. Prior to this, the record is devoid of any indication that Mrs. Burnham was involved in any way.

Mrs. Burnham to meet her later at a downtown Juneau hotel. Mrs. Burnham declined, saying she was tired and was going to go home.

Shortly after Officer Peterson left the counter area, the package was delivered to Alephe Morris, who signed for it and the two women left the airport in an automobile registered to Richard and Sudie Burnham and operated by Sudie Burnham.

As the Burnham vehicle left the airport it was followed by Peterson, Glass and McCoy, each in separate vehicles. In the vicinity of the Black Angus Restaurant, Burnham, with Morris still in the car, crossed over the Egan Expressway onto Old Glacier Highway. Lt. McCoy followed while Peterson and Glass turned toward Juneau on Egan Expressway.

McCoy was ultimately forced to pass Burnham when she slowed down but Officer McCracken, of the Juneau Police Department, took McCoy's place and followed Burnham to 4½ Mile Old Glacier Highway where she turned in and stopped at the Burnham residence, where both women exited the car and entered the residence.

While no one involved in the surveillance was able to see whether the package was taken into the residence by either of the women, Sgt. Glass was able to look inside the Burnham vehicle while it was parked in the driveway and observe wrapping paper, apparently from the package, but no package itself. Glass returned to the other officers and told them to prepare to enter the Burnham residence.

It is now some 15 to 20 minutes since the two women entered the Burnham residence and just as the officers began their approach from a point down the road, the Burnham automobile was observed to be leaving the driveway. No one had seen either woman leave the residence and enter the vehicle. Sgt. Glass followed the vehicle 400 or 500 yards down the road and stopped it, after which he and Trooper McCoy approached the vehicle and asked the occu-

pants to get out, which they did. Mrs. Burnham asked why she was being stopped and was told by Sgt. Glass that the police believed that a package picked up at the Juneau airport contained narcotic drugs and they were conducting an investigation. At about this time Officers McCracken, Peterson, Bowman, Glass, McCoy and the district attorney were all visible to Mrs. Burnham.

The two women were advised of their *Miranda* rights and each indicated a desire to have an attorney present. Sgt. Glass interpreted this as a desire on the part of each to remain silent.

Glass took Mrs. Burnham to his vehicle where he advised her that he had a search warrant for her residence, that he knew what was in the package and asked if she would consent to a search of her car. Burnham wanted to know if a search of her residence would be necessary if she consented to a search of her car. Glass conferred with the district attorney and advised Burnham that if what they were looking for was found in the car, the residence would not be searched. Burnham signed a waiver for a search of the automobile.

During the time of Glass' original request of Mrs. Burnham for consent to search the vehicle, McCoy observed the package inside the vehicle while he was standing on the passenger side looking through the windshield. McCoy informed Glass of this fact when Glass went to talk to the district attorney, but Glass never told Burnham that McCoy had seen the package.[5]

Once Burnham consented to a search of the vehicle, the officers entered the car and removed the package, which had been opened, but then reclosed so that the contents were not visible. The brown paper wrapping was lying where Glass had earlier observed it, and he would have seen the package at the same time had it been on the floor in front of the passenger seat when he looked into the vehicle as it was parked in the Burnham driveway. In any event, the package was opened, the con-

---

5. McCoy observed the package resting on the floor of the vehicle immediately in front of the passenger seat, and he informed Glass of that fact.

tents seized and the two women taken to Johnson Human Resource Center. [Our quotation from Judge Schulz' decision ends here.]

## DISCUSSION

Morris and Burnham apparently argued that the "search" by De Alesandro was not for a legitimate airline purpose; that the activities of the D.E.A. agent (Wallace) were improper; and that the Alaska search warrant should not have been issued nor the package seized from Burnham's vehicle.

Judge Schulz ruled that the inspection by De Alesandro was not prohibited. With regard to the activities of Wallace, Judge Schulz explicitly found that, contrary to the assertion of Morris and Burnham, Wallace did not x-ray the package, and that the information received by Wallace from De Alesandro was sufficient to justify detention of the package and the sniff-search by the canine agent, Ryker. As to the warrant, Judge Schulz held that while there was a sufficient showing of probable cause for the issuance of a warrant, the one issued here did not comport with the basic requirements for anticipatory warrants under *Johnson v. State,* 617 P.2d 1117 (Alaska 1980), and thus could not support the search of the package. He also rejected the state's argument that Burnham had consented to the search of her vehicle, citing *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Finally, Judge Schulz concluded that while *seizure* of the package could be upheld either on the basis of the "plain view" doctrine or as the result of a legitimate search incident to arrest, neither theory would support the immediate *opening* of the package. Therefore, Judge Schulz ruled that the contents of the package would not be admissible at trial.

The state petitioned for review, characterizing Judge Schulz' ruling regarding the warrant as based upon "the failure to particularly specify the place to be searched for the package," and arguing (1) that the warrant had no such defect and (2) that the portion of the warrant that allowed opening of the package could be severed from any defective portion and applied to the ultimate seizure under the plain view or incident to arrest theories. We conclude that Judge Schulz erred in suppressing the contents of the package which the police seized and find that the package was properly opened pursuant to the warrant.

The warrant provided, after finding probable cause:

> "You are therefore commanded in the evening, after the arrival of Fl. 69 on 4/8/82 to make search on the person of: (4) Alephe Morris or whoever picks up said package or the premises situated at: (5) wherever the described package is taken to (and you may enter and search for said package upon having followed it to the place into which it is taken and you may open said package and identify and seize its contents for the following property: The above described package ..."

The warrant is obviously an anticipatory warrant—a warrant which is based upon an affidavit which shows probable cause at some future time for a search. The general concept of an anticipatory search was approved in *Johnson v. State,* 617 P.2d 1117 (Alaska 1980).

Anticipatory warrants present difficult drafting problems because the magistrate does not decide that probable cause exists at the time the police obtain the warrant; rather, he decides that probable cause to search exists if particular anticipated events occur in the future. Thus, generally an anticipatory warrant will require the police to decide that the anticipated events, or conditions precedent, have occurred before they can search. This state of events creates a tension between two interests. The fourth amendment requires the decision to authorize a search to be made by a magistrate, not the police.[6] On

---

**6.** The following language is from *Keller v. State,* 543 P.2d 1211, 1219 (Alaska 1975):

The purpose of the warrant requirement is to prevent the police from hasty, ill-advised, or unreasonable actions in "the often competitive enterprise of ferreting out crime." The law allows the police to infringe upon a person's fundamental right to be free from

the other hand, courts need to encourage the use of warrants by the police and need to recognize that anticipatory warrants meet certain police exigencies.[7] The solution to this tension is, of course, to draft the anticipatory warrant narrowly so that the police have as little discretion as possible in determining whether there is probable cause to search. This appears to be more easily said than done.

■ Judge Schulz ruled that the warrant was invalid and therefore could not be used to justify the search because it was a general warrant in that it did not designate a particular place to be searched. In light of the record before us we believe it is unnecessary for us to decide whether the warrant in question would have been sufficient to permit the search of any residence or automobile to find the package in question. It is only necessary for us to determine that the warrant is not drafted so broadly that it is necessary for us to invalidate the warrant as a general warrant since the package came into the hands of the police in a constitutionally authorized manner so that it was lawfully seized. Although the warrant did not designate a particular place which the police were to search, the warrant does not allow the police authority to search any number of places. Rather the warrant anticipates that a person will pick up the package and take it to a place.

Assuming the police are able to follow the package to that place, they are then authorized to enter that place and seize the package. The warrant anticipates a search of that particular place and limits the search to a search for that package. We simply do not see this warrant as being so general in nature that the constitution requires us to condemn it as a general warrant and to rule that the warrant was invalid for any purpose.

■ As it turns out, the police followed the package to a residence. However, they apparently could not tell whether the package entered the residence or remained in the car. After a 15 to 20 minute period, the police legitimately stopped the car and the package legitimately came into police hands because it was in plain view and also because the police could seize it incident to the arrest of the occupants of the vehicle. We conclude that under these circumstances the police could open the package. They had followed the package as the warrant directed and the package came into their hands legitimately. The fact that they did not have to enter a house to seize the package and that instead the place where the package wound up turned out to be a car rather than a residence should not invalidate the warrant as far as allowing the police to open the package. No one disputes the fact

search and seizure only when such infringement is reasonable. The conclusion that the imposition is reasonable should not be drawn by the very persons who are the agency for the deprivation of right. (citation and footnote omitted)

7. The policies supporting anticipatory warrants are strong, as explained in *Alvidres v. Superior Court,* 12 Cal.App.3d 575, 90 Cal.Rptr. 682, 685–86 (Cal.App.1970):

The entire thrust of the exclusionary rule and the cases which have applied it is to encourage the use of search warrants by law enforcement officials.

One of the major difficulties which confronts law enforcement in the attempt to comply with court enunciated requirements for a "reasonable" search and seizure is the time that is consumed in obtaining search warrants.

The speed with which law enforcement is often required to act, especially when dealing with the furtive and transitory activities of persons who traffic in narcotics, demands that the courts make every effort to assist law enforcement in complying with the edicts that the courts themselves have issued.

We must ask ourselves whether the objective of the rule is better served by permitting officers under circumstances similar to the case at bar to obtain a warrant in advance of the delivery of the narcotic or by forcing them to go to the scene without a warrant and there make a decision at the risk of being second-guessed by the judiciary if they are successful in recovering evidence or contraband. We believe that achievement of the goals which our high court had in mind in adopting the exclusionary evidence rule is best attained by permitting officers to seek warrants in advance when they can clearly demonstrate that their right to search will exist within a reasonable time in the future.

that there was probable cause to believe that the package contained contraband at the airport and that the package was adequately described. It is also undisputed that the police knew that the package which they opened was the one described in the warrant. The only question which remains is whether the fact that the police lost sight of the package for 15 to 20 minutes would mean that they had not followed the conditions of the warrant and/or their probable cause no longer existed because they did not observe the package during that short period of time. We do not believe that the fact that the police officers could not see the package during the 15 to 20 minute period is of such significance that we must invalidate the search of the package. When a magistrate issues a warrant which authorizes the police to follow a package of contraband he certainly anticipates that the police will not be able to observe the package at all times and may even temporarily lose sight of the people who have the package. Here the police followed Morris and Burnham directly to a residence. Although the police temporarily did not know where the package was, this fact should not prevent the police from opening the package under the warrant. There will be few times when the police follow such a package when they will not temporarily lose sight of the people being followed or where they can state with certainty that the contraband was not discarded or hidden along the way. Contraband can always be taken out of a package which the police are following and concealed in some way, leaving the police following an empty package. We simply do not see the possibility that something along those lines happened in this case to be any greater than in any other ordinary case. We therefore conclude that after the police properly seized the package of cocaine, the search warrant which they had, which authorized them to search that package, was valid. We accordingly reverse the judgment of the superior court which suppressed the evidence in question.

REVERSED.

SINGLETON, Judge, concurring.

I join in the court's decision.

In my view, the issue in this case is much simpler than it appears to the other members of this court or to the eminent trial judge. The issue, as I see it: May a police officer (1) armed with a warrant based on probable cause, (2) authorizing the search and seizure of a particularly described closed container, (3) open that container without violating the fourth amendment or comparable provisions of our state constitution, (5) when it legally comes into his possession without recourse to the warrant, (6) where the warrant is defective[1] (a) in describing potential places where the container described in the warrant might have been found or (b) because the magistrate issuing the warrant may not have had a

---

1. I assume for purposes of discussion but do not decide that this warrant was defective for the reasons set out by Judge Schulz. It is a very close question.

Chief Judge Bryner and Judge Schulz are legitimately concerned that this warrant creates the risk of Morris and Burnham visiting a number of residences on their way home from the airport. Thus, officers possessing this warrant might feel justified in searching every residence visited. More likely, they might feel justified in searching that residence visited by Morris and Burnham which for reasons not disclosed to the magistrate the police had the most interest in searching. Once having access to that residence, the police could then seize any contraband found in "plain view" whether or not described in the warrant. Such a use of the warrant would expose Morris' and Burn-

ham's social friends to all the risks of the general warrants condemned in the constitution. It is feared that to allow the search and seizure in this case will encourage the future issuance of similar warrants amenable to the same abuses and that the only way to prevent the harm is either to void the warrant *ab initio* as a general warrant or conclude that it died and could serve no function after Morris and Burnham left the first residence they visited after leaving the airport. I share this concern. Had the warrant been used to search any residence after the first, serious questions would be presented. I prefer to address them in a case in which they are squarely presented. I assume that the state's prosecutors, having been warned, will ensure that warrants, including anticipatory warrants, are drafted with greater specificity in the future.

basis for finding probable cause to search some or all of the potential places contemplated in the warrant? I conclude that the officer may open the closed container. This conclusion disposes of this case.

As I understand it, the trial court and all the members·of this court agree that the package under discussion was properly seized (without reliance on the warrant) either incident to an arrest or because it was in plain view in the defendant's automobile. We also all agree, I believe, that authority to seize a closed container does not automatically provide authority to open it. *See Texas v. Brown,* —— U.S. ——, ——, 103 S.Ct. 1535, 1546, 75 L.Ed.2d 502, 519 (1983) (Stevens, J., concurring).[2] Normally, an officer legally seizing a closed container based on probable cause to believe that it contains contraband is required to take it before a magistrate and obtain a warrant to search it in the absence of exigent circumstance or consent. I assume that neither exigent circumstances nor effective consent was present here. The question is: Does the normal rule apply when the officer already has gone before a magistrate and obtained a valid warrant (albeit defective in other respects) for the closed container in question where it legally comes into his hands without recourse to the warrant? I conclude that the normal rule does not apply and that the officers could search the container previously legally seized. As the United States Supreme Court pointed out in *Mapp v. Ohio,* 367 U.S. 643, 657, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081, 1091 (1961): "There is no war between the constitution and common sense." No one contends, in this proceeding, that the magistrate issuing the warrant did not properly find probable cause to seize this package or that it was not particularly described in the warrant issued. It would serve no useful

purpose to require a second warrant to search the very package described in the first warrant. *See* 2 W. LaFave, *Search and Seizure,* § 4.6(f), at 111–12 (1978); *cf.* 2 W. LaFave, *supra,* § 4.8(f), at 137 (constitution does not require "useless gestures").

Finally, I conclude that the circumstances under which the partially opened package in question was found were sufficient to enable the officers to determine with reasonable certainty that it was the package described in the warrant, *see* 2 W. LaFave, *supra,* § 4.6(a), at 96 (1978), and that it had not been materially changed in the interim. *See Illinois v. Andreas,* —— U.S. ——, 103 S.Ct. 3319, 76 L.Ed.2d —— (1983). Judge Schulz found that there was probable cause to believe that it was the same package as part of his decision that it could lawfully be seized incident to an arrest. In deciding whether a given item is the one described in a warrant, I would conclude that "reasonable certainty" and "probable cause" are essentially synonymous. *See Johnson v. State,* 617 P.2d 1117, 1123–24 (Alaska 1980) (treating the word "positive" and the phrases "reasonably certain" and "probable cause" as essentially synonymous in a situation similar to this one). *But cf. Illinois v. Andreas,* —— U.S. at ——, 103 S.Ct. at 3325 (requiring in a similar situation, except warrant not obtained, that there be no "substantial likelihood ... that the contents of the shipping container were changed during the brief period that it was out of sight of the surveilling officer"); *id.* at ——, 103 S.Ct. at 3329 (Stevens, J., dissenting) ("virtual certainty" required).

Given these conclusions, I find it unnecessary to address the other issues debated in the parties' briefs and the opinions of Judge Coats and Chief Judge Bryner, *i.e.,* to determine whether the warrant in question was

---

**2.** *See also Metcalfe v. State,* 593 P.2d 638, 640 (Alaska 1979). *But cf. Hinkel v. Anchorage,* 618 P.2d 1069 (Alaska 1980) (permitting search incident to arrest of closed containers "immediately associated" with the arrestee without a warrant, consent or exigent circumstances); *McCoy v. State,* 491 P.2d 127 (Alaska 1971) (refusing to distinguish between right to seize closed container on arrested person and right

to search container). No one has argued that the package in question was "immediately associated" with either person arrested. Nevertheless, *Hinkel* did indicate the common sense approach our supreme court takes to problems presented by search and seizure and supports the conclusion that two warrants should not be required for a single container.

insufficiently particular in describing potential dwellings and automobiles to be searched, since no dwellings or automobiles were searched in reliance on the warrant, or to delve into the law of anticipatory warrants or controlled deliveries. *See Illinois v. Andreas,* —— U.S. ——, 103 S.Ct. 3319, 76 L.Ed.2d —— (1983); *Johnson v. State,* 617 P.2d 1117 (Alaska 1980); *State v. Witwer,* 642 P.2d 828 (Alaska App.1982).

BRYNER, Chief Judge, dissenting.

I am concerned that Judge Coats' opinion fails to address a number of important and potentially meritorious constitutional arguments that bear directly on the validity of the warrant in this case and are necessary to resolve in order to sustain the search.[1] Nevertheless, I deem it unnecessary to address these issues in my dissent, since I think that, even assuming the anticipatory search warrant was validly issued, it cannot be relied upon to justify the search of the package found in Sudie Burnham's car. I believe that a careful consideration of the language in the warrant supports Judge Schulz' conclusion that the search in this case must be evaluated under standards applicable to warrantless searches and seizures.

In *Johnson v. State,* 617 P.2d 1117 (Alaska 1980), the Alaska Supreme Court approved the use of anticipatory search warrants in Alaska and emphasized that in appropriate circumstances such warrants can be of vital significance in aiding the legitimate purposes of law enforcement. I have no quarrel with the supreme court's ruling in *Johnson,* and I support its assessment of the value and significance of anticipatory warrants.

The court in *Johnson,* however, recognized that, in order to guard against abuse, careful attention must be paid to the preparation and issuance of anticipatory warrants. In particular, the court emphasized that an anticipatory warrant must make clear on its face the anticipated events that will trigger its provisions and authorize commencement of a search. *See Johnson v. State,* 617 P.2d at 1124 n. 11. In the present case, the primary event specified as a prerequisite to execution of the anticipatory warrant was the requirement that the package containing drugs be "followed" after being picked up at the airport. Although Judge Coats' opinion finds difficulty in determining the scope of this requirement, and Judge Singleton's concurring opinion would give this requirement little weight insofar as seizure and search of the packet is concerned, I believe that the language of the warrant must be enforced, and I think that determining the meaning of the language is a relatively simple task, involving little more than a straightforward reading of the warrant and common sense.

In context, it seems apparent that the warrant, by requiring the package to be "followed ... to the place into which it is taken" was meant to establish a requirement of reasonably continuous surveillance as a precondition of the seizure of the package and of the search of its contents. This was the manner in which Judge Schulz in-

1. I also take exception to that portion of the majority opinion which states that, in dealing with anticipatory warrants, "the magistrate does not decide that probable cause exists at the time the police obtain the warrant; rather, he decides that probable cause to search exists if particular anticipated events occur in the future." I think this language is incorrect and potentially misleading. Both the United States and Alaska constitutions require that warrants be issued based upon a showing of probable cause. No lesser standard exists, and this same requirement applies to anticipatory warrants. Anticipatory warrants cannot be used as a vehicle for a magistrate to delegate to the police his constitutionally mandated duty to determine existence of probable cause. The distinction between a traditional search warrant and an anticipatory warrant does not depend upon whether probable cause will be established before or after the warrant is issued. In all cases a showing of probable cause must precede issuance of the warrant. With anticipatory warrants, the difference lies in the fact that the showing of probable cause will establish that evidence of a crime is likely to exist at a specified future time and under specified future conditions. The issuance of an anticipatory warrant does not, therefore, leave determination of probable cause to officers charged with executing the warrant. Instead, officers need only determine whether the anticipated events triggering the anticipatory warrant have occurred.

terpreted the warrant, and I believe that his interpretation should not be disturbed unless it is found to be clearly erroneous. I cannot conclude that Judge Schulz' interpretation of the warrant was clearly erroneous. The face of the warrant must be read in a fair and reasonable manner, one that is calculated to effectuate the intent of the judge who originally issued it. By requiring the package to be "followed," the issuing judge plainly intended to assure that the package and the people who possessed it would be monitored sufficiently closely to prevent the package or its contents from being replaced, altered or destroyed. In other words, the warrant required a level of surveillance that would assure that the package, its whereabouts and its contents, could reasonably be accounted for at all times prior to the search authorized by the warrant, a standard akin to the "chain of custody" standard provided for under our rules of evidence. See Alaska R.Evid. 901 commentary at 268 (1980).

Based on the record before us, I believe that an appropriate level of surveillance was maintained up to and including the time that Burnham and Morris left their automobile and entered Burnham's home. At this point, however, police lost track of the package. Visual inspection of Burnham's automobile led police to believe that the package had been taken inside the house. Some fifteen to twenty minutes elapsed before officers observed Burnham and Morris driving away from the house; there is nothing to indicate that officers observed the package being carried back from the house to the car. To this date, it has apparently not been determined with certainty whether the package was in the car or in the house during this fifteen to twenty minute interval. When Burnham was ultimately stopped, investigating offi-

cers actually believed that the package was still at her house.

Given these circumstances, I do not think it is fair to say that the officers who were charged with executing the search warrant "followed" the package to its ultimate point of seizure; they did not maintain reasonably continuous surveillance over it in any realistic sense. While Burnham and Morris were in Burnham's house, the package was unaccounted for and its whereabouts were unknown; the amount of time that elapsed would have been more than ample to permit destruction or adulteration of any substance originally contained in the package, or even replacement of the original package with another, similar package. There is virtually nothing in the record to support the conclusion that, after Burnham was stopped and officers looked into her car, they were positive that they had discovered the original package that contained drugs. To the contrary, after Burnham was stopped, officers were certain only that the car contained the wrapping from the original package; the wrapping had previously been seen in Burnham's car when Burnham and Morris were in Burnham's house, but at that time there did not appear to be a package in the car. After Burnham was stopped, officers observed a box, which they *assumed* to be the one originally contained in the wrapping. While this assumption may have been a reasonable one, it could hardly make up for the fact that the package had not been continuously "followed," as required by the warrant.

In short, I agree with Judge Schulz that the warrant created, on its face, a condition that was violated when continuous surveillance over the package ceased; continuous surveillance ceased when surveillance over the package and the people who possessed it was interrupted for a substantial period of time.[2] Thus, even assuming the warrant as

---

**2.** *Cf. Illinois v. Andreas,* —— U.S. ——, 103 S.Ct. 3319, 76 L.Ed.2d —— (1983) (warrantless opening of a shipping case containing drugs approved where container was previously lawfully opened and inspected by police and then resealed and delivered to the defendant, and where the size and specialized purpose of the shipping container made it unlikely that its

contents had been changed during a 30–45 minute break in surveillance that occurred while the container was in the defendant's possession).

While the approach advocated by Judge Singleton in his concurring opinion is persuasive and makes a good deal of sense, I am ultimately not convinced that it resolves the basic prob-

originally issued was valid, by the time Burnham's car was stopped, the package was no longer being "followed," reasonably continuous surveillance had not been maintained pursuant to the requirements of the warrant, and, by its own terms, the warrant could no longer be deemed enforceable.[3]

Analysis of the issue in this case from a slightly different perspective similarly indicates that, even if originally valid, the anticipatory search warrant was no longer effective after Burnham and Morris left Burnham's house. A common sense reading of the search warrant, in its entirety, indicates that it was meant to allow officers two options: first, to seize the package immediately after it was picked up at the airport; or, second, to follow the package to its initial destination, which could then be searched. To read the warrant more broadly, by interpreting it to allow police to follow the package, over a period of time, to a number of different locations, thus permitting officers to choose which "premises" they wanted to search, cannot be justified. Such an interpretation would convert the warrant into an impermissible, general authorization for officers to substitute their judgment for that of the magistrate and to select arbitrarily the premises they desired to search. In order to avoid this unconstitutional result, it is reasonable to construe the warrant as being meant to allow police, at most, to follow the package to the premises where it was first taken after being claimed and to permit a search of only those premises. Thus, implicit in the warrant is the limitation that the warrant would not apply beyond the original premises to which the package was taken. Under this interpretation, the warrant ceased to be effective after Morris and Burnham left Burnham's house.

Adopting either approach, I believe it must be concluded that the warrant authorizing search and seizure of the package containing drugs was no longer enforceable when police stopped Burnham's car. The conduct of the officers at the scene supports this conclusion. Significantly, police officers who seized the package from Burnham's car and opened it never claimed to be

---

lems of this case. The concurring opinion treats the portion of the warrant authorizing seizure and search of the package as severable from the authorization to conduct a search of the premises where the package was to be taken; Judge Singleton concludes that the authorization to seize and search the package was in effect nonanticipatory in nature, and therefore not problematical.

I believe this conclusion to be flawed for two reasons. First, there can be no doubt that the warrant was an anticipatory one, both in authorizing a seizure and search of the package and in authorizing a search of the premises into which the package was to be taken. The warrant permitted seizure and search of the package only after it was claimed at the airport by Alephe Morris or some other person. Since, at the time the warrant was issued, the package had not yet been delivered to the airport or claimed by anyone, this aspect of the warrant was obviously anticipatory. Second, by the express language of the warrant, the requirement that the package be "followed" at all times after it was claimed served as a condition precedent to both the search of premises and the seizure and search of the package authorized by the warrant. Both aspects of the warrant were governed by this precondition.

Thus, I do not think that the lack of compliance with the warrant's requirement of reasonably continuous surveillance can be disregarded for purposes of evaluating the lawfulness of the search conducted in this case.

3. The opinion written by Judge Coats skirts these problems by pointing out that probable cause existed to open the package, even though it had been lost from view for more than a quarter of an hour. While this observation may be correct, it begs the issue of whether the opening of the package was authorized by the warrant. Probable cause, standing alone, could not have justified a warrantless opening of the package. Thus, the crucial inquiry is not whether probable cause existed when the package was opened, but rather whether the circumstances under which it was opened complied with the requirements of the anticipatory warrant. To the extent that Judge Coats' opinion implies that the warrant could lawfully have purported to authorize seizure and search of the package at any time and under any circumstances, so long as probable cause existed to open it, I must disagree. Such an interpretation would be contrary to the plain language contained on the face of the warrant and would be at odds with Judge Schulz' interpretation of that language. More significantly, such an interpretation would inevitably render the anticipatory warrant so broad that the constitutional requirement of particularity would not be satisfied.

executing the previously issued warrant. To the contrary, the record indicates that officers at the scene of Burnham's arrest thought the warrant only authorized them to enter and search Burnham's home. There is nothing in the record to indicate that officers who seized and opened the package purported to be executing the anticipatory warrant.

Given my conclusion that the warrant had already expired by the time that the package was seized, opening it could only be justified by an exception to the warrant requirement. I believe that Judge Schulz properly found that, while officers had the right to seize the package under the plain view and search incident to arrest exceptions to the warrant requirement, neither of these exceptions could justify actually opening the package. *See, e.g., Dunn v. State,* 653 P.2d 1071, 1082–83 (Alaska App.1982). Similarly, even under the broad interpretation recently announced by the United States Supreme Court, the automobile exception to the warrant requirement might have justified seizure of the package, but it would not necessarily have permitted a search. *See United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).[4]

I thus conclude that Judge Schulz was correct in ruling that the search of the package taken from Burnham's car amounted to an invalid, warrantless search. I would affirm the suppression order entered by the superior court.[5]

---

4. In *Ross,* the United States Supreme Court extended the automobile exception to the warrant requirement to allow a warrantless search of all areas of an automobile and all relevant containers found therein where there was probable cause to search the automobile. In so holding, however, the court distinguished cases involving probable cause to believe that an automobile contained contraband from cases in which there was probable cause to believe that a specific container contained contraband, and the container was subsequently placed in an automobile. The court in *Ross* indicated that this latter type of case would continue to be governed by its prior rulings in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

5. The state has not argued that the inevitable discovery doctrine should be adopted under the circumstances presented here; apparently no such argument was made before Judge Schulz. Given the lack of briefing on the issue and given the fact that application of the inevitable discovery doctrine involves both factual and legal questions, I do not think it appropriate to consider the doctrine at this stage. I would not, however, foreclose consideration of the issue on remand, if raised by the state. It is virtually uncontested that the police lawfully seized the package from Burnham's car. In light of the fact that a warrant had previously been issued for the search of the package containing drugs, and since, by all appearances, the package seized was the original package, it seems difficult to believe that a warrant to open the package would not have been issued. Assuming that the inevitable discovery doctrine were adopted in Alaska, it seems that applicability of the doctrine to this case would merit consideration.