**UNITED STATES of America**

v.

**Javier ROBLES, Defendant.**

**No. 02 CR 609(SAS).**

United States District Court, S.D. New York.

Dec. 13, 2002.

---

Patrick A.H. Watts, Bronx, NY, for Defendant.

Rosemary Nidiry, Asst. U.S. Atty., Southern Dist. of New York, New York City, for U.S.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Defendant Javier Robles is charged with possession of a firearm by a convicted felon in violation of Title 18 U.S.C. §§ 922(g)(1) and (2).[1] Robles now moves to suppress two 9mm pistols, a silencer,

1. The statute was amended on November 2, 2002. *See* Pub.L. No. 107–273, 116 Stat. 1758 (2002).

and a butterfly knife seized at the time of his arrest. *See* 6/10/02 Notice of Omnibus Motion at 1; Affirmation of Patrick Watts, defendant's attorney ("Watts Aff.") at 4. An evidentiary hearing was held on July 16, 2002. Post-hearing briefs and reply briefs were submitted the first week of August 2002. For the reasons set forth below, the motion to suppress is granted.

## I. UNCONTESTED FACTS

On March 15, 2002, Sergeant Edward M. Barry, Police Officer Mark O'Connell, and Police Officer Michael Garrity were on street patrol as part of their duties as members of the Anti-Crime Unit of the 43rd Precinct in the Bronx. *See* 7/16/02 Transcript ("Tr.") at 10–13, 85–87. The officers, dressed in civilian clothes, were patroling in an unmarked police car. *See id.* at 13, 87. Officer Garrity was driving, Sergeant Barry was in the front passenger seat, and Officer O'Connell was in the back seat. *See id.* at 14, 87.

At approximately 1:00 p.m., the officers were driving westbound on Lafayette Avenue, approaching the busy intersection of Lafayette Avenue and Commonwealth Avenue. *See id.* at 14, 18, 47–49, 86–87. All of the officers were familiar with the intersection because they had worked in the area for many years. *See id.* at 14, 45, 86.

Sergeant Barry noticed a white sports utility vehicle ("SUV" or "truck") with tinted windows traveling west on Lafayette Avenue directly in front of the police car. *See id.* at 17, 19, 24, 49, 91. The SUV was stopped in the center of the intersection, preparing to make a left turn onto Commonwealth Avenue. *See id.* at 20. Lafayette Avenue is a two-way street, and there was traffic traveling eastbound. *See id.* at 19.

Robles was the driver of the truck. *See id.* at 145. He was accompanied by one passenger, Luis Alejandro, who was sitting in the front passenger seat. *See id.* Robles was driving with his left arm in a sling. *See id.* at 37, 64, 107, 140, 145.

Robles made the left turn onto Commonwealth Avenue, heading toward his home. *See id.* at 146. Officer Garrity also turned left onto Commonwealth Avenue and continued to follow the truck. *See id.* at 21, 86–87. The officers had never before encountered Robles, Alejandro, or the truck. *See id.* at 41–42, 96–97, 140.

## II. CONTESTED FACTS

### A. Defendant's Version

The government and defendant contest what happened next. Robles claims that at approximately 1:10 p.m., he parked his truck in front of his house at 711 Commonwealth Avenue,[2] *see* Affidavit of Javier Robles ("Def.Aff.") at ¶¶ 2, 5, which is approximately 30 yards from Seward Avenue.[3] *See* Tr. at 130; *see also* Statement of James J. Thompson, Private Investigator, Ex. A to Defendant's Post–Hearing Memorandum of Law ("Def.Post–Hrg. Mem."). Robles and the passenger exited the vehicle, *see* Tr. at 106; Def. Aff. at ¶ 2, and closed the doors, *see* Tr. at 137–39. While Robles was crossing in front of his vehicle on the way to his house,[4] *see id.* at

---

2. Alejandro testified that the truck was parked in front of 713 Commonwealth Avenue. *See* Tr. at 132. The houses at 711 and 713 Commonwealth Avenue are connected by a "drive-thru." *See id.* at 133.

3. The testimony of Lorraine Santiago, a woman who went to Robles's house on March 15, 2002, "looking for an apartment," was consistent. She testified that Robles's truck was parked outside his house, which is located three houses from the corner of Seward Avenue. *See* Tr. at 105–06.

4. Santiago testified that Robles was "out of the truck walking to his home," when the officers got out of their car. *See* Tr. at 106–07. This testimony is consistent with Robles's account. *See* Def. Aff. at ¶ 2.

134, and Alejandro was walking toward him on the way to his own car, which was parked across the street, *see id.* at 133, they both noticed a car with no lights on pull up behind Robles's truck, *see id.* at 106, 133; Def. Aff. at ¶ 2.

The three officers got out of the car and approached Robles and Alejandro. *See* Def. Aff. at ¶ 2. They did not display a badge or say "police." *See* Tr. at 135–36. One of the officers asked Robles what he was doing in the neighborhood. *See* Def. Aff. at ¶ 2. Robles informed the officer that he lived at 711 Commonwealth Avenue. *See id.* The officer then identified himself as a police officer, *see* Tr. at 137, and asked Robles for his license, registration, and insurance card, all of which Robles provided. *See* Def. Aff. at ¶ 2; *see also* Tr. at 137.

Robles and Alejandro were then taken to the back of Robles's truck, *see* Tr. at 137; Def. Aff. at ¶ 2, while one of the officers conducted a search of the truck's interior. *See* Def. Aff. at ¶ 2. As a result of the search, a gun was recovered from inside the truck. *See* Memorandum of Law in Support of Omnibus Motions ("Def.Mem.") at 2. Robles and Alejandro

were then handcuffed and placed under arrest. *See* Tr. at 140.

While Robles was being arrested, he was frisked by one of the officers, who asked him if he had anything sharp on his person. *See id.* Robles informed the officer that he had only a small pocket knife, attached to his belt, which he promptly gave to the officer. *See id.*

Robles contends that "[a]t no time on March 15, 2002, did [he] possess a gravity knife inside of [his] truck." Def. Aff. at ¶ 4. Robles also contends that at no time, on March 15, 2002, did he "commit any traffic violations while [he] was driving [his] truck." *Id.* at ¶ 3.

### B. Prosecution's Version

The officers' version of what transpired is very different. According to Sergeant Barry, the truck made an erratic, fast left-hand turn, failing to yield to oncoming traffic, in violation of the New York Vehicle and Traffic law.[5] *See* Tr. at 20, 48–50. After Robles made the left, he pulled over[6] to the right and stopped about 25 to 30 feet from the intersection, *id.* at 21–22, near 730 Commonwealth Avenue.[7] The

---

**5.** A driver attempting to make a left turn at an intersection must "yield the right of way to any vehicle approaching from the opposite direction, which is . . . so close as to constitute an immediate hazard." *See* N.Y. Veh. & Traf. Law § 1141.

**6.** The officers' testimony at the hearing was unclear as to whether the police initiated the stop of the truck or whether Robles stopped on his own accord. *See* Tr. at 22, 43–44, 88; Affirmation of Sergeant Edward M. Barry ("Barry Aff."), Ex. B to Government's Post–Hearing Memorandum of Law in Opposition to Defendant Javier Robles' Motion to Suppress ("Gov't Post–Hrg. Mem."), at 1.

**7.** The officers have offered inconsistent accounts of where the stop occurred. The two state court complaints filed by Officer O'Connell at the time of the arrest contain differing

statements as to where the stop occurred (*i.e.* in front of 713 or 730 Commonwealth Avenue). *See* 5/16/02 Bronx Criminal Complaint for Criminal Possession of a Weapon, Ex. A to Gov't Post–Hrg. Mem., at 1; 5/16/02 Bronx Criminal Complaint for Criminal Possession of a Controlled Substance and Unlawful Possession of a Knife, Ex. A to Gov't Post–Hrg. Mem., at 3. In their hearing testimony, both Sergeant Barry and Officer Garrity testified that the stop occurred in front of 711 and 713 Commonwealth Avenue, which is in front of Robles's home and closer to Seward Avenue. *See* Tr. at 43, 46, 98. In Sergeant Barry's post-hearing affirmation, he stated that the stop, in fact, occurred in the vicinity of 730 Commonwealth Avenue, which is an even number address located on the left side of Commonwealth Avenue, closer to Lafayette Avenue. *See* Barry Aff. at 1–2.

officers pulled behind the truck and put on their police lights. *See id.* at 57–58, 88, 95.

As the officers left their vehicle, Alejandro was exiting the truck. *See id.* at 25, 89. Robles was still seated in the driver's seat. *See id.* at 26. When Alejandro was approximately one foot past the front door of the truck, parallel to the back door, *see id.* at 54, Sergeant Barry identified himself as a police officer and instructed Alejandro to walk toward Officer O'Connell, who was standing behind the truck. *See id.* at 26, 54, 59, 90. The passenger obeyed, leaving the front passenger door wide open. *See id.* at 26, 55.

Sergeant Barry walked to the passenger side of the truck and looked inside the open front door. *See id.* at 26. He saw what appeared to be a butterfly knife[8] in the center console area. *See id.* at 29. Upon noticing the knife, which he believed to be dangerous and illegal under New York law, *see id.* at 81–82, Sergeant Barry directed Officer Garrity, who was on the driver's side of the truck, *see id.* at 26, 59, to have Robles step out of the truck, *see id.* at 31, 62. Sergeant Barry then reached into the truck[9] and secured the knife. *See id.* at 32, 61.

Because the tinted windows made it difficult to see whether there were other passengers in the car, Sergeant Barry opened the back door on the passenger side of the truck. *See id.* at 32, 35, 69. Sergeant Barry did not find any other people in the vehicle, but saw what appeared to be the butt of a handgun on the floor behind the driver's seat.[10] *See id.* at 35, 36. Sergeant Barry reached in and picked up the item, confirmed that it was in fact a handgun, and secured the gun. *See id.* at 36. He then signaled to his partners that he had found a weapon. *See id.* at 37–38, 92.

Officers Garrity and O'Connell took Robles and Alejandro into custody. *See id.* at 38, 92. Officer O'Connell searched Robles's person and found a small amount of what appeared to be cocaine,[11] a straw, and a knife clipped to his belt. *See id.* at 93.

The officers then accompanied Robles and Alejandro to the 43rd Precinct station house for processing. *See id.* at 39, 94. The truck was also transported back to the station house where it was vouchered and inventoried. *See id.* at 39–41, 73, 77. During the inventory search, an additional firearm with a silencer, numerous rounds

---

**8.** Sergeant Barry originally testified that he found a gravity knife. *See* Tr. at 29. On cross-examination, he conceded that the knife he found was actually a butterfly knife rather than a gravity knife because it had no device to press in order to eject the blade. *See id.* at 51–52, 82. Possession of a butterfly knife is *not* a crime in New York. *See* N.Y. Penal Law § 265.

**9.** Defendant's witness, Sigfredo Bermudez, an assistant manager and service adviser at Liberty Chevrolet, the dealership from which Robles purchased his Chevy Tahoe, *see* Tr. at 115–17, originally testified that it would be impossible for an individual standing "outside on the passenger side of the vehicle" to reach the front center console area. *See id.* at 118. When further questioned by the Court, however, Bermudez reluctantly conceded that it may be *possible,* but only if the person

"lean[ed] over a great way based on the height of the truck." *See id.* at 119.

**10.** When asked whether an individual standing at the rear passenger door, looking into the vehicle, would be able to notice an item on the floor sticking out from under the front driver's seat, Bermudez originally testified that "based on the height of the truck, [he, himself] would not be able to see under the seat." *See* Tr. at 123. However, when the question was restated, Bermudez conceded that a person "would be able to ... notice something there if [he were] looking into it with the door open." *See* Tr. at 124.

**11.** A lab report later revealed that the substance was in fact heroin. *See* Police Laboratory Controlled Substance Analysis Report, Ex. D to Gov't Post–Hrg. Mem.

of ammunition, U.S. currency in the sum of $1790, a police scanner, and flex cuffs were recovered from the truck. *See id.* at 41, 77–78.

## III. FINDINGS OF FACT [12]

### A. The Officers Encountered Robles on the Street in Front of His Home

■ Based on my review of the entire record, I find that Robles parked the SUV in front of his house at 711 Commonwealth Avenue, which is approximately 200 yards from the intersection of Lafayette and Commonwealth and 30 yards from Seward Avenue. After he and Alejandro exited the truck and closed all the doors, they noticed a car pull up behind them. Three men got out of the car and approached Robles and Alejandro in the street. Sergeant Barry questioned Robles about why he was in the neighborhood. Sergeant Barry only then identified himself as a police officer and asked Robles for his license, registration, and insurance card. Robles and Alejandro were subsequently directed to go to the rear of the truck. At this point, Robles and Alejandro had no choice but to obey the officer's order.

I base this finding on the following evidence. *First,* all of the defense witnesses consistently testified that Robles's truck was parked in front of his house and that Robles and Alejandro already had exited the car when Robles was approached by the officers. *Second,* the testimony of the officers was inconsistent as to the location of the alleged stop. *Third,* the testimony of the officers regarding whether or not they had initiated a "stop" of the vehicle was conflicting. I therefore credit Robles's account that he was approached by the officers on the street in front of his house, rather than stopped in his vehicle.

### B. There Was No Traffic Violation

■ I further find that Robles did not commit a traffic violation for a combination of the following reasons: (1) the government offered no evidence of a traffic violation recorded in the officers' contemporaneous memo books and no evidence of a traffic ticket issued; (2) the officers would have been unable to make a left turn right behind Robles if traffic were such that Robles had to make a "fast left" to avoid oncoming cars;[13] and (3) the stop for a "fast left" would have occurred closer to the intersection—not approximately 200 yards down the block. I therefore credit the affidavit of Robles and testimony of Alejandro[14] that Robles did not make an

---

**12.** Once a defendant establishes a factual basis for a suppression motion, the government must prove that the search was proper by a preponderance of the evidence. *See United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Calvente,* 722 F.2d 1019, 1023 (2d Cir.1983).

**13.** Under New York traffic law, Robles's left turn would only have been illegal if the traffic in the opposite direction posed an "immediate hazard." *See supra* n. 5.

**14.** It is true that courts "give greater weight to [witness] testimony, which was subject to

cross examination, than to [sworn] affidavits." *United States v. Gardner,* 611 F.2d 770, 774 n. 2 (9th Cir.1980). *See also United States v. Frank,* 8 F.Supp.2d 284, 291 n. 2 (S.D.N.Y.1998) (crediting the testimony of witnesses over the allegations in an affidavit because the affidavit was not subject to cross-examination and the court found the testifying witnesses fully credible). *But see United States v. Long Huang You,* 198 F.Supp.2d 393, 400–01 (S.D.N.Y.2002) (basing findings of facts largely on defendant's affidavit when agents' testimony was not credible). However, even after affording the officers' testimony greater weight than Robles's sworn statement because it was subject to cross-examination, I do not find the officers' testimony on this point to be credible.

improper left turn, nor speed or drive erratically.[15]

### C. The Butterfly Knife and Gun Were Found When Sergeant Barry Searched the Truck

Finally, I find that the gun and butterfly knife were found while Sergeant Barry searched the truck after detaining Robles and Alejandro at the rear of the truck. Sergeant Barry's testimony that he saw the butterfly knife in plain view through the open front passenger door is simply not credible. If Alejandro had walked past the front passenger door before he was summoned by Sergeant Barry, there is no credible reason why he would have left the door wide open. If the door was closed, the knife could not have been in plain view, especially given that the side windows were tinted.

The officers additionally testified that they found the gun under the driver's seat when they did a protective search of the vehicle. The purported rationale for this protective search also lacks credibility. Sergeant Barry testified that he had to reach into the car to retrieve the knife from the front console area. According to Bermudez, who offered credible testimony, Sergeant Barry would have had to place his entire torso inside the vehicle for him to be able to reach that knife. If Sergeant Barry had done so, he would have been able to determine at that time whether there were other passengers in the truck.

## IV. LEGAL STANDARD

 The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and sei-

zures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "As our [Fourth Amendment] cases make clear, there are three levels of interaction between agents of the government and private citizens," each level requiring a different degree of justification. *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). *First*, the police may initiate a voluntary encounter with an individual and ask questions as long as the person is willing to listen. *See Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir.2000). Such an encounter does not constitute a seizure and therefore does not require any justification nor does it "trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). *Second*, the police may briefly detain a person as part of an investigation if they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'." [16] *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). *Third*, the police may arrest an individual if they have probable cause to believe that she has committed a felony or a criminal offense in their presence. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354–55, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001).

## V. DISCUSSION

 The initial encounter between Robles and the officers on the street was a "voluntary" encounter, the first type of interaction under Fourth Amendment jurisprudence, because it involved consensual questioning without either a brief in-

---

**15.** The evidence that Robles's left arm was in a sling does not necessarily suggest that he was driving erratically and could equally support a finding that he was driving slowly and cautiously to compensate for his disability.

**16.** These investigatory searches have come to be known as *Terry* stops.

vestigatory detention or an arrest—the second and third levels of interaction, respectively. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870 (holding that mere questioning of an individual by police in a public place does not rise to the level of a "seizure" unless additional circumstances exist which make it reasonable for the individual to believe his liberty has been restrained); *see also INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (holding "police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.").

██ However, once Sergeant Barry instructed Robles to wait behind the truck as he searched Robles's vehicle, the interaction lost its consensual nature and ripened into a seizure because a reasonable person in defendant's position would have concluded, at that point, that he was being detained and was not free to leave.[17] *See United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir.1992) (noting that a consensu-

al encounter becomes a seizure when a reasonable person under all the circumstances would believe he is not free to walk away or otherwise ignore a police officer's presence); *see also United States v. Sugrim,* 732 F.2d 25, 28 (2d Cir.1984) (holding "[a] detention no matter how momentary is a seizure under the Fourth Amendment"). Therefore, the seizure or arrest of Robles was permissible only if the officers had probable cause. *See Atwater,* 532 U.S. at 354–55, 121 S.Ct. 1536.

██ The sole justification proffered by the government for Robles's seizure is the alleged traffic violation, which did not occur. *See supra* Part III.B. Because the government has articulated no other basis for the officers to have believed a crime had been or was being committed in their presence,[18] the seizure of Robles was unlawful. Any evidence that was recovered as a result of that unlawful seizure, *i.e.* during the initial search of the vehicle, must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 491–92, 83 S.Ct. 407, 9 L.Ed.2d 441 (recognizing that evidence seized based upon an illegal seizure is subject to the fruit of the poisonous tree doctrine, and may be suppressed).[19]

17. Even if Robles had not been unlawfully detained, the government has not articulated any permissible basis for entering the car. *See infra* n. 19.

18. The truck's tinted windows may have provided grounds for a traffic stop because tinted windows are a violation of New York Vehicle and Traffic Law. *See* N.Y. Veh. & Traf. Law § 375 (12–a) (b); *see also United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994) (holding observation of a traffic violation constitutes reasonable suspicion for a traffic stop). However, I have found that there was no traffic stop and the government did not raise the tinted windows as a basis for the alleged stop. The fact that the officers may have noticed the tinted windows once they encountered Robles on the street does not provide reasonable suspicion to justify a *Terry* investigatory stop or probable cause to justify an

arrest because tinted windows may be a traffic violation but not criminal activity.

19. The government offers two arguments to justify the search of the vehicle even if the seizure of Robles was unlawful. The government contends that because Sergeant Barry observed a butterfly knife in plain view in the truck, "the officers had probable cause to believe that the occupants of the car had committed a crime," and therefore had authority to search the car. *See* 1/28/02 Government Letter Brief ("Gov't.Ltr.Br.") at 4–5; Gov't Post–Hrg. Mem. at 13, 15–16; *see also Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) (authorizing "the seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal

Likewise, the subsequent search of Robles's person and vehicle cannot be justified as a search incident to a lawful arrest because the arrest was unlawful. *See Illinois v. Lafayette,* 462 U.S. 640, 644, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (allowing police officers to search the person of an arrestee, once a vehicle has been stopped, if the officers make a valid arrest of the occupant); *Cf. South Dakota v. Opperman,* 428 U.S. 364, 375, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (authorizing warrantless routine inventory searches only of vehicles lawfully impounded). Accordingly, any additional physical evidence seized from Robles's person and truck must be suppressed.

## VI. CONCLUSION

For the reasons set forth above, Robles's motion to suppress the evidence is granted. A conference is scheduled for December 20, 2002, at 4:30 p.m.

activity"). Because I do not credit Sergeant Barry's testimony that he saw a knife through the open front passenger door, and find instead that the knife was discovered during the search of the vehicle, *see supra* Part III.C., the plain view doctrine does not apply.

The government additionally argues that there was "immediate probable cause to believe that the car contained evidence of criminal activity, justifying a warrantless search of the [car] under the 'automobile exception' to the warrant requirement." Gov't. Ltr. Br. at

5; *see United States v. Harwood,* 998 F.2d 91, 96 (2d Cir.1993) (citing *Carroll v. United States,* 267 U.S. 132, 156, 45 S.Ct. 280, 69 L.Ed. 543 (1925)) ("A warrantless search of a movable vehicle is permissible when the police have probable cause to believe that the vehicle contains contraband."). However, the government has offered no evidence, other than the knife (which itself was illegally seized), to demonstrate probable cause to believe that there was any criminal activity afoot. Thus, this argument is also unavailing.