IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 11, 2005

## STATE OF TENNESSEE v. JULIO CESAR HERNANDEZ SALINAS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-D-2439     Cheryl Blackburn, Judge**

---

**No. M2004-00811-CCA-R3-CD - Filed July18, 2005**

---

The defendant, Julio Cesar Hernandez Salinas, was convicted of conspiracy to deliver more than 70 but less than 300 pounds of a Schedule VI controlled substance, marijuana, and sentenced as a Range I, standard offender to eleven years in the Department of Correction. On appeal, he argues the trial court erred by: (1) denying his motion to suppress on the basis that he lacked standing; (2) not allowing defense counsel, during voir dire, to ask prospective jurors about their involvement in religious and social organizations; (3) permitting the State to question a trial witness as to the defendant's prior bad acts; and (4) imposing a sentence of eleven years. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Theodora A. Pappas, Nashville, Tennessee, for the appellant, Julio Cesar Hernandez Salinas.

Paul G. Summers, Attorney General and Reporter; Richard H. Dunavant, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and John C. Zimmerman and Katy Hagan, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

We confine our summary of the lengthy trial proceedings to the facts relevant to the issues presented in this appeal. The following facts are gleaned from the testimony of trial witnesses as well as the testimony of witnesses at the pretrial suppression hearing. According to the State's proof, on August 22, 2002, a tractor-trailer truck driver hauling a load of produce from Texas to Illinois was instructed to pick up two additional pallets of watermelons in McAllen, Texas, and drop them off in Nashville. After picking up the two large cardboard boxes filled with watermelons and attached

to wooden pallets, the truck driver began receiving numerous calls on his cellular phone from someone named "Carlos," who kept inquiring about the status and location of the delivery. The truck driver became suspicious and contacted his employer, who in turn contacted agents with the Alabama Drug Enforcement Administration ("DEA"). After inspecting the pallets and finding they included under the watermelons several large bundles of marijuana wrapped in plastic, the DEA agents contacted the Metropolitan Nashville Police Department ("MNPD"). At that time, the agents accompanied the truck driver to Nashville and met with MNPD officers in Williamson County to arrange a controlled delivery.

Around 10:00 p.m., the truck driver, after having been debriefed and fitted with a transmitting device by MNPD officers, telephoned the number he had been given instructions to call when he arrived in Nashville. After the driver parked his truck at a Hardee's restaurant, as instructed by the party at the number he had called, he and his passenger walked across the street to a Circle K convenience store and got into a Dodge Durango driven by the defendant who was accompanied by codefendant Jose Melendez. They proceeded to a warehouse on Airline Drive and, after the manager of a business in the complex, later identified as codefendant Arthur Signoracci, refused to come unlock the warehouse, they returned to the driver's semi-truck and told the driver to make the delivery the next day. The next day, the truck driver received varying instructions and was finally told to deliver the two pallets of watermelons to a specific address in the complex around 10:00 a.m. When the truck driver arrived at 1830 Airline Drive, Suite 11, on the day of the delivery, the defendant and codefendant Melendez helped guide the truck into the loading dock. Also present was codefendant Francisco Bruno. Signoracci, who had an agreement with the defendant to store the defendant's pallets in exchange for $1,000, unloaded the two pallets of watermelons into the warehouse, where there were also several business employees, and the truck driver drove away from the premises. At that time, the defendant, Melendez, and Bruno got into the Dodge Durango and attempted to leave the premises. They were stopped and arrested by law enforcement officers who proceeded into the front and rear of the warehouse and seized the marijuana weighing approximately 140 pounds and arrested Signoracci.[1]

MNPD Officer Ed Rigsby, assigned to the Twentieth Judicial Drug Task Force, testified that his supervisor, Sergeant James McWright, advised him that the Alabama DEA had intercepted a load of "approximately 140 pounds of marijuana" and that "the truck driver that had found this load of marijuana in his truck had agreed to make the controlled delivery . . . in Nashville." The truck driver had become "suspicious of the load because the person that loaded the two crates of watermelons with marijuana on to [sic] his truck kept calling him, so he called his boss and then his boss contacted DEA and they agreed to assist [the MNPD] in making the controlled delivery in Nashville." Officer Rigsby fitted the truck driver with a transmitting device, and the truck driver made telephone contact with the Nashville contact. Officer Rigsby, whose "main objective at that particular time was to guard the marijuana," observed the truck driver get into a blue Dodge Durango with two Hispanic males, leave, and return a short time later. The load was not delivered, however,

---

[1]Salinas, Melendez, and Bruno were tried jointly; the trial court granted Signoracci's "Motion to Continue Trial" and his case was severed from the other three.

because "[t]here was some problem about getting the keys that night" and "they couldn't deliver it and had to wait until in the morning." The next morning, after a 10:00 a.m. delivery time had been set, Officer Rigsby followed the semi-truck to 1830 Airline Drive, which he described as a "horseshoe" complex with offices in the outer part and delivery bays in the inner part of the complex. He observed the semi-truck back into the warehouse bay door for Suite 11, and, in addition to the defendant and the codefendants, there were "probably eight or ten people that worked there at the place that were also standing out in the bay." By this time, Officer Rigsby had positioned himself so that he could see the faces of the defendant and codefendants and observed them assist the truck driver in backing up to the bay door. According to Officer Rigsby, the defendant was acting "more or less like [a] supervisor[]" in assisting the truck driver. After the two pallets of watermelons were unloaded, the bay door was closed and the semi-truck left. Melendez joined the defendant and Bruno inside the warehouse, and all three were arrested by other officers a short time later as they attempted to leave the premises. Officer Phillip Taylor then opened the rear doors to allow Officers Rigsby and Mike Garbo to enter the warehouse, where Rigsby saw codefendant Signoracci "standing beside the two crates of watermelons that had the marijuana in it. One of the packages of marijuana was sitting on top," and there were a total of seven "big block square packages o[f] marijuana."

MNPD Sergeant James McWright testified that he is the sergeant over the Drug Task Force in Davidson County and was advised by his supervisor, Lieutenant J.D. Jones, that "the Alabama Drug Enforcement Administration had called him to say that they had a cooperating individual and a tractor load of marijuana that they wanted to send to Nashville." Sergeant McWright met the DEA agents and the truck driver, who was Hispanic and "spoke fluent Spanish," in the Cool Springs area of Williamson County. The driver had been instructed to call a telephone number as soon as he arrived in Nashville so he could "get directions on where he was to deliver" the pallets of watermelons. Once the driver arrived and parked at the Hardee's, other officers conducted surveillance on the semi-truck, while Sergeant McWright followed the defendant and Melendez, who were in the Dodge Durango, after they dropped the truck driver off at the Circle K. The delivery was not made that night because the defendants "couldn't get a hold of the man that had the keys to unlock the suite, . . . the warehouse where they were to unload it." After the delivery was made the next day and the defendant, Melendez, and Bruno were leaving the warehouse, Sergeant McWright "gave the order to move in and arrest all the individuals and to secure the loading dock where the watermelons and the marijuana had been offloaded at." Sergeant McWright later participated in a consensual search of a house in Nashville where the defendant paid the rent and his pregnant girlfriend, Adriana Montemayer, lived, and of the defendant's primary residence in Murfreesboro where his wife and three children lived.

MNPD Officer Michael Garbo, an interdiction officer with the Twentieth Judicial Task Force, testified that he went with the other officers to meet the truck driver in Williamson County, where they "looked at the truck" and "view[ed] the load." On the day of the delivery, Officer Garbo, along with Officer Rigsby, conducted surveillance of the warehouse and the defendants. After the delivery, Officer Taylor opened the back door to let them into the warehouse. Officer Garbo testified as to what happened once he entered the warehouse:

At the time, there was a lot of people inside of the business. There was a lot of civilian employees. The actual owner or manager of the business was inside. Essentially, what I did was assist the other officers. Of course, the crates of watermelons which contained marijuana were inside the business. I basically secured the watermelons and the marijuana and assisted the other officers with any type of paperwork they needed.

MNPD Officer Aaron Thomas testified that he was responsible, *inter alia*, for transporting the defendant from his residence in Murfreesboro after the officers searched it back to Nashville for booking. The defendant, after having been advised of his rights at the time of his arrest, began conversing with Officer Thomas during the drive back to Nashville. The defendant told Officer Thomas he "was thinking about the situation he was in and was trying to figure out who was the weak link." In addition, the defendant stated that this delivery was "only about his fourth time" to participate in the delivery of marijuana to Nashville and that the previous deliveries were "always 140 pounds or less." The defendant admitted he was making "about five thousand dollars" for the current shipment, which was about thirty-five dollars profit per pound.

Vickie Summers, the office manager at TennStar International, the business operated by Signoracci and located at the warehouse where the marijuana was delivered, testified that after the watermelons were delivered but before the police arrived, Signoracci asked her to come into the warehouse to look at the watermelons:

Mr. Signoracci had come up to the front of the office and said that he had a friend, that he had some produce, that had an excess amount of produce and they had dropped them by and they were in the warehouse, and that he had planned on taking these watermelons to the county fair and selling them. And he asked me to come back there and look at them, so I walked to the warehouse and saw a couple of boxes of watermelons.

She said that their company manufactured organic cleaning chemicals and was not involved in the produce business. However, a few weeks prior to the delivery of the watermelons, a similar delivery of limes had arrived at the warehouse; and Signoracci told her that he had come in at 4:00 a.m. for that delivery. Additionally, she recalled that a shipment of cabbage had been delivered in January 2002 in a similar manner. She also stated that the company had six employees and, on the day of the controlled delivery, there were "four extra employees at that time."

MNPD Detective Isaac Wood testified that he was the "case agent" assigned to the investigation and that the truck driver, who was "afraid" of reprisal for his cooperation with the police, was paid $1,000 out of a special drug proceeds seizure fund for cooperating with the police and another $5,000 to make a subsequent trip to Nashville in lieu of testifying at trial to meet with the defense attorneys.

The defendant testified during the hearing on his motion to suppress but elected not to do so at trial or to present any witnesses.

## ANALYSIS

### I. Denial of Motion to Suppress Evidence

The defendant filed a pretrial motion to suppress evidence which the trial court denied, following an evidentiary hearing, concluding that he lacked standing to contest the search. Asserting that he had a "reasonable expectation of privacy in the warehouse and loading dock which he leased from Mr. Signoracci," the defendant argues on appeal that the law enforcement agents "had ample notice as to the specifics of the delivery" and "should have sought an anticipatory search warrant in order to search the warehouse" and that the trial court erred in concluding that the defendant lacked standing. The State again argues that the defendant lacked standing to challenge the search of the warehouse.

We review the trial court's denial of the defendant's motion to suppress by the following well-established standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's application of law to the facts, as a matter of law, is reviewed *de novo*, with no presumption of correctness. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). This court may consider the proof at trial, as well as at the suppression hearing, when considering the appropriateness of the trial court's ruling on a pretrial motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that because the rules of appellate procedure "contemplate that allegations of error should be evaluated in light of the entire record[,]" an appellate court "may consider the proof adduced both at the suppression hearing and at trial").

Only two witnesses testified at the September 24, 2003, pretrial hearing on the motion to suppress. The thirty-three-year-old defendant said he was born in Mexico, had lived in the United States for "[a]lmost 13 years," was a "registered alien," and spoke "about 75%" English. He said he had been introduced to Signoracci by Bruno about three years earlier, and his role in the marijuana delivery enterprise was "[o]n contract from Texas to right here, make the business of the drugs, and I'm contract to my, say my warehouse, part of my warehouse right here." He said his job was to

"[g]et the marijuana here . . . and sell the marijuana right here" at the loading dock. According to the defendant, the loading dock was usually locked and he "never had the keys" to the business. He made arrangements with Signoracci to use space in his warehouse to store pallets and paid Signoracci $1,000 after each delivery was completed. He said that the warehouse "wasn't in a public space" and that he "pa[id] rent expecting some privacy." According to the defendant, on the day of the delivery, the "marijuana just come in covered up with the watermelons because [he was] expecting a little bit of privacy." At the time, there were other legitimate business employees present in the warehouse, and the defendant responded affirmatively when his trial counsel asked whether he "felt like [he] could tell Mr. Signoracci to make them leave" if he "didn't really trust them." He said that his buyer went by the street name, "Wine," and that he had attempted to leave shortly after the delivery because Wine had called to say he would not be ready to pick up the marijuana for several hours. The defendant responded in the negative when trial counsel asked if he expected "somebody from the government" or "strangers off the street" to enter the warehouse.

On cross-examination, the defendant acknowledged he never had a key to either the front entrance of the business or the rear entrance to the warehouse. On the night of August 22, 2002, he told Signoracci he needed to access the warehouse, but Signoracci refused to come and open it because it was "too late" and he was "tired." He said he had participated in four deliveries before the one for which he was arrested and acknowledged telling Detective Wood at the time of his arrest that Bruno was the person who made "the arrangements to store the marijuana, usually in a warehouse, until it [was] time to deliver it to other dealers." He also agreed that Signoracci unloaded the pallets containing the watermelons from the truck and that the truck driver and the other legitimate employees could see the pallets from where they were standing in the warehouse. He acknowledged he had no written agreement with Signoracci, nor did he pay for electricity, phones, or property taxes for the warehouse.

Testifying for the State, Detective Isaac Wood said that the informant truck driver was picked up by the defendant and codefendant Melendez on the night before the delivery, and they drove to the warehouse complex; however, they were not able to enter the warehouse at that time so they returned the driver to his semi-truck to await further instructions concerning the delivery. After the delivery, the defendant, Melendez, and Bruno attempted to leave the warehouse but were arrested "just before they got on to the roadway."

Subsequently, on November 10, 2003, the trial court issued an order denying the motion to suppress, concluding that the defendant lacked a legitimate expectation of privacy in the warehouse and, therefore, did not have standing to challenge the search and seizure of the contraband:

> One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place or thing to be searched. State v. Oody, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991), perm. to appeal denied, (Tenn. 1991). One who does not have such an expectation of privacy lacks "standing" to challenge the search. State v. Patterson, 966 S.W.2d 435, 441 n.5 (Tenn. Crim. App. 1997). There are seven factors to be considered when determining

-6-

if a legitimate expectation of privacy exists: (1) ownership of the property; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether the defendant has a right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from intrusion by the State; (6) whether the defendant took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises. Oody, 823 S.W.2d at 560; see also State v. Turnbill, 640 S.W.2d 40, 46 (Tenn. Crim. App. 1982).

Considering the factors set forth above, the Court concluded under the facts of this matter that: (1) Defendant had no property ownership; (2) he did have a possessory interest in the seized marijuana; (3) he had no possessory interest in the searched warehouse; (4) he had no right to exclude others from the place; (5) he did exhibit a subjective expectation that the place would remain free from governmental invasion; (6) it is unclear whether he took normal precautions to hide the marijuana, but he did cover it with watermelons and use detergent to cover any odor; and (7) he was legitimately on the premises.

At the suppression hearing, Defendant testified that he would borrow Mr. Signoracci's warehouse as needed and would pay $1000.00 as a "subleassee" [sic] each time for the use of the warehouse. He stated that he had borrowed the warehouse approximately four times total; the deliveries were not regular and sometimes there would be a two to three or six to seven month period between delivers [sic]. He conceded that there was no written agreement to use the warehouse; that he did not have control to exclude people, namely Mr. Signoracci's employees, from the warehouse during deliveries; and that he did not have keys to the warehouse. In order to obtain access to the warehouse, he and his associates had to call Mr. Signoracci and wait for him to unlock the warehouse for them. And, if Defendant wished to exclude employees from the warehouse, he would have had to request that Mr. Signoracci order them to leave. Further, during his interview with Officer Woods [sic], Defendant stated that it was Mr. Bruno who would make arrangements with Mr. Signoracci to use the warehouse for deliveries. Defendant did not usually deal directly with Mr. Signoracci. (footnote omitted).

. . . .

Accordingly, the Court finds that Defendant has failed to establish a legitimate expectation of privacy in the place searched. Defendant's motion to suppress is, therefore, DENIED on the basis that Defendant lacks standing to assert a challenge to the search of the warehouse and its loading dock.

We will consider the defendant's claim that the trial court erred in concluding that he did not have standing to contest the search and seizure. The Fourth Amendment to the United States

Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Likewise, the Tennessee Constitution guarantees "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ." Tenn. Const. art. I, § 7.

"The Fourth Amendment protects legitimate expectations of privacy rather than simply places." Illinois v. Andreas, 463 U.S. 765, 771, 103 S. Ct. 3319, 3324 (1983). "One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place where property is searched." Oody, 823 S.W.2d at 560 (citing Rawlings v. Kentucky, 448 U.S. 98, 100 S. Ct. 2556 (1980); State v. Roberge, 642 S.W.2d 716, 718 (Tenn. 1982)). "It is settled law that the Fourth Amendment's protections against arbitrary searches and seizures are presumptively applicable not only in an individual's home, but also in any commercial premises he may own or use." United States v. Cardoza-Hinojosa, 140 F.3d 610, 613 (5th Cir. 1998) (citation omitted). This court has adopted the seven-factor test enunciated by the United States Court of Appeals for the Fifth Circuit in United States v. Haydel, 649 F.2d 1152 (5th Cir. 1981), for determining whether an individual has exhibited an actual, subjective expectation of privacy and, therefore, has "standing" to contest a search or seizure. See Oody, 823 S.W.2d at 560; State v. Turnbill, 640 S.W.2d 40, 46 (Tenn. Crim. App. 1982). Those seven factors, which the trial court applied, are as follows: (1) property ownership; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether he has a right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether he took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises. Oody, 823 S.W.2d at 560. The Tennessee Supreme Court has characterized this test as a "totality of the circumstances approach." State v. Ross, 49 S.W.3d 833, 841 (Tenn. 2001).

We begin our analysis by noting that the Fourth Amendment acts as a restraint only on government actors, not private citizens. "The essence of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730 (1967)); see also United States v. Jacobsen, 466 U.S. 109, 115, 104 S. Ct. 1652, 1657 (1984) (A private employee's invasion and inspection of parcel entrusted to a private contract freight carrier "were occasioned by private action" and "did not violate the Fourth Amendment because of their private character."); State v. Zagorski, 701 S.W.2d 808, 812 (Tenn. 1985) ("Fourth Amendment protection is inapplicable to a search or seizure effected by a private individual not acting as an agent of the government or with the participation or knowledge of any government official."). Thus, the actions of the truck driver in discovering the marijuana in his truck raise no constitutional issues. Additionally, the defendant lost any expectation of privacy he might have had in the pallets of watermelons and marijuana as soon as the contraband was discovered by a private citizen, in this case, the informant truck driver. United States v. Morgan, 744 F.2d 1215, 1218, 1221 (6th Cir. 1985) ("Even a wrongful search or seizure by a private party does not violate Fourth Amendment rights,

and the government may utilize such evidence if it has acquired such evidence lawfully," and "appellants had no reasonable expectation of privacy protected under the Fourth Amendment" after shipped package was opened by carrier employee.). Obviously, once the suspicious truck driver discovered that unwittingly he had been carrying a large amount of illegal contraband, he was justified in contacting the police who acted lawfully in seizing the contraband in plain view. See Andreas, 463 U.S. at 771, 103 S. Ct. at 3324 ("The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy."). The fact that the truck driver and his employer notified law enforcement authorities and cooperated with them in making a controlled delivery did not revive any previously held privacy interest in the contraband. See id. at 769 n.2, 771 ("When common carriers discover contraband in packages entrusted to their care, it is routine for them to notify the appropriate authorities. The arrival of police on the scene to confirm the presence of contraband and to determine what to do with it does not convert the private search by the carrier into a government search subject to the Fourth Amendment." In addition, "[n]o protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal. The simple act of resealing the container to enable the police to make a controlled delivery does not operate to revive or restore the lawfully invaded privacy rights."). In Andreas, the United States Supreme Court explained the rationale for making a "controlled delivery" of previously discovered contraband:

> The lawful discovery by common carriers or customs officers of contraband in transit presents law enforcement authorities with an opportunity to identify and prosecute the person or persons responsible for the movement of the contraband. To accomplish this, the police, rather than simply seizing the contraband and destroying it, make a so-called controlled delivery of the container to its consignee, allowing the container to continue its journey to the destination contemplated by the parties. The person dealing in the contraband can then be identified upon taking possession of and asserting dominion over the container.

> . . . .

> Controlled deliveries of contraband apparently serve a useful function in law enforcement. They most ordinarily occur when a carrier, usually an airline, unexpectedly discovers what seems to be contraband while inspecting luggage to learn the identity of its owner, or when the contraband falls out of a broken or damaged piece of luggage, or when the carrier exercises its inspection privilege because some suspicious circumstance has caused it concern that it may unwittingly be transporting contraband. Frequently, after such a discovery, law enforcement agents restore the contraband to its container, then close or reseal the container, and authorize the carrier to deliver the container to its owner. When the owner appears to take

-9-

> delivery he is arrested and the container with the contraband is seized and then searched a second time for the contraband known to be there.

Andreas, 463 U.S. at 769-70, 103 S. Ct. at 3323 (quoting United States v. Bulgier, 618 F.2d 472, 476 (7th Cir.), cert. denied, 449 U.S. 843, 101 S. Ct. 125, 66 L. Ed. 2d 51 (1980)) (footnotes omitted). Accordingly, the defendant lost any previously held expectation of privacy in the contraband when it was discovered by the truck driver; and the involvement by law enforcement in arranging a controlled delivery did not revive any previously held expectation of privacy in the container or its contents.

We agree with the trial court, as it utilized the seven Haydel factors, that the defendant lacked any legitimate expectation of privacy in the warehouse where the controlled delivery was made and therefore lacked standing to challenge the search of the warehouse. While he had a possessory interest in the marijuana, the defendant did not establish that he also had a possessory interest in the warehouse. His testimony at the suppression hearing was that he expected the warehouse to remain free from governmental invasion, and he was apparently legitimately on the premises.[2] However, we conclude, as we will explain, that these factors are outweighed by others which demonstrate that the defendant had no expectation of privacy in the warehouse. First, it is uncontroverted that he did not own the building and never had possessed the keys to it. He, therefore, could not freely access the building but was at the mercy of Signoracci as to when he could enter. He also never had the right to exclude others from the warehouse and did not take "normal precautions" to maintain his privacy. Signoracci's legitimate employees had free and unfettered access to the warehouse area where the contraband was stored. "'Neither possession nor ownership of property establishes a legitimate expectation of privacy unless the party *vigilantly protects the right to exclude others*.'" Ross, 49 S.W.3d at 843 (quoting United States v. Torres, 949 F.2d 606, 608 (2nd Cir. 1991)) (emphasis added). In fact, on the night of the planned delivery, the defendant was unable to enter the building when Signoracci refused to allow him access, apparently because of the lateness of the hour. The following day, when the delivery was made, several employees were in the warehouse and saw the pallet of watermelons sitting in the middle of it. Further, we note that the defendant had no exclusive right to use the warehouse. In fact, Signoracci was running a legitimate business out of the warehouse, maintained a key and free access to it, and could have given anyone else permission and a key as well. See State v. William D. Ware, No. 01C01-9803-CC-00129, 1999 WL 378341, at *7 (Tenn. Crim. App. June 11, 1999). We conclude, therefore, "'in light of all the surrounding circumstances,'" that the defendant did not have a legitimate expectation of privacy in Signoracci's building. Turnbill, 640 S.W.2d at 46 (quoting Rakas v. Illinois, 439 U.S. 128, 152, 99 S. Ct. 421, 435 (1978)). Accordingly, he lacked standing to contest any search of the warehouse.

---

[2]At least one court has held that because the defendant was not physically on the premises of the searched building at the time of the search, then he was literally not "legitimately on the premises." See Cardoza-Hinojosa, 140 F.3d at 617. In the present case, the defendant was attempting to leave the premises and leave the contraband at the warehouse when he was arrested at the edge of the physical boundary of the property.

-10-

We do note, however, that Officer Phillip Taylor testified at a pretrial hearing on codefendant Signoracci's motion to suppress the marijuana that at the time of the delivery of the contraband to the warehouse, the officers knew only what warehouse complex the delivery was to be made but did not know which specific business within the complex. While the practice of obtaining anticipatory search warrants has been approved by Tennessee courts, one requirement is that the affiant provide to the issuing magistrate a specific place to be searched after a controlled delivery. See, e.g., State v. Wine, 787 S.W.2d 31, 33 n.2 (Tenn. Crim. App. 1989) (noting that "[a]nticipatory search warrants are issued based on probable cause to believe that evidence of illegal activity will be found at a *particular place* at a time in the future, rather than probable cause to believe evidence is to be found at the time the search warrant issues") (emphasis added).

## II. Voir Dire Restrictions

The defendant contends that the trial court erred in not allowing defense counsel, during voir dire, to ask members of the venire whether they were involved in religious or social organizations. On appeal, the defendant "submits that the social and political organizations that a person belongs to might reveal a certain propensity for prejudice," especially if they are members of "very strict, conservative religions" or "radical political organizations." The State contends that the trial court did not abuse its discretion by keeping voir dire within relevant bounds and that the defendant cannot contest the composition of the jury on appeal because he did not exhaust his peremptory challenges.

The purpose of voir dire is to ensure that jurors seated at trial are competent, unbiased, and impartial. See State v. Mann, 959 S.W.2d 503, 533 (Tenn. 1997). The trial court is granted broad discretion in deciding the manner in which voir dire will be conducted, and its decisions in this regard will not be disturbed on appeal absent a showing of abuse of discretion. See State v. Austin, 87 S.W.3d 447, 471 (Tenn. 2002) (citing State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994)), cert. denied, 538 U.S. 1001, 123 S. Ct. 1899, 155 L. Ed. 2d 829 (2003). We review the defendant=s issue, therefore, under an abuse of discretion standard.

During voir dire, the following exchange occurred:

[DEFENSE COUNSEL]: I have some additional questions for ya'll [sic] and they should be somewhat brief.
        First of all, Mr. Coyle, do you have any opinions as to what could be done to reduce crime?

THE COURT: [Counselor], make the question more relevant to this case. That is a very broad question, so make it relevant to this case.

[DEFENSE COUNSEL]: Do you have any ideas in terms of controlling the drug problem?

THE COURT: Approach the bench.

(A BENCH CONFERENCE WAS held, on the record, in the presence of the jury, but out of the hearing of the jury, and the following proceedings were had:)

THE COURT:  I don't really care what their opinion is about controlling the drug problem, [Counselor].  It is not relevant to this case.

[DEFENSE COUNSEL]:  Well, I don't want somebody who wants to hang drug dealers.

THE COURT: Well, ask them if they have any problem but this is not a general philosophical thing about what they do or what they don't do.  Make it relevant to this case.  Do you have any problem, you know, what is your general philosophy about what is not relevant to this case.

[DEFENSE COUNSEL]:  Can I say –

THE COURT:  No, you are not going to ask that question so rephrase it.

. . . .

[DEFENSE COUNSEL]:  Can I ask about if they are a member of any religious or social –

THE COURT:  No.

(SAID BENCH CONFERENCE having been completed, the following proceedings were had in open court:)

[DEFENSE COUNSEL]:  Do you have any opinions on the morality of drug use?

MR. COYLE:  Yes, I do.

[DEFENSE COUNSEL]:  And could you tell me about that?

MR COYLE:  Drug use is immoral.

THE COURT:  [Counselor], I'm sorry, but we need to ask the questions related to this case.  I mean, I appreciate every juror in here probably has an opinion about the morality or immorality of drug use.  That is not necessarily relevant to his case.  Okay, so rephrase your question.

-12-

[DEFENSE COUNSEL]: I don't know how to rephrase that type of question so I will just move on to a different question.

At the hearing on the motion for new trial, the trial court addressed the defendant's issue:

[DEFENSE COUNSEL]: The second [basis for new trial] concerns the issue of voir dire.

THE COURT: Let me ask you this: With regard to that, did you use all of your challenges?

[DEFENSE COUNSEL]: I don't believe that I did.

THE COURT: Okay. Then how can you complain about voir dire?

[DEFENSE COUNSEL]: Because I was not able to ask the questions in order to make an intelligent use of the remaining challenges that I had without asking -- without being able to ask that particular question concerning what sort of social, political, and/or religious organizations. Everybody would look the same to me until I heard responses.

THE COURT: Okay. Well, you didn't use all your challenges. And whether or not somebody is involved in any social, religious, political organizations, that question in and of itself is just not relevant as to whether or not somebody can serve on a jury. That was the determination I made at the time, and that's the way I still feel. Now, this case didn't involve anything that would even remotely relate to that.

. . . .

[DEFENSE COUNSEL]: First of all, because my client was Hispanic I was concerned about possible racial prejudice on that. . . .

THE COURT: You were not prevented from asking the question: Does anybody merely because the defendant is Hispanic would that affect -- that you would -- based on that reason and that reason alone you could not be fair to my client. Did you ask that question?

[DEFENSE COUNSEL]: No.

THE COURT: Did I prevent you from asking that question?

[DEFENSE COUNSEL]: No.

. . . .

THE COURT:  Well, the problem with your theory, [counselor], is that you've got to ask that question.  If you want to say you can't use your challenges correctly, you're going to have to ask the question that's, one, relevant to this trial.

Because somebody might belong to some strange or unusual social, religious, or political organization in and of itself is not a relevant question.  It takes up the Court's time.  The question you really want to ask is: For the mere reason that the defendant might be Hispanic will you because of that not be fair.  That's what you want to know, and that's what you need to ask.  And I didn't prevent you from asking that question.

[DEFENSE COUNSEL]:  No, you didn't.

. . . .

Concerning the religious organizations, that was concerning my client's -- the questioning that was probably going to be coming up concerning my client being an adulterer and having impregnated his mistress and that coming out possibly at trial -- and it did -- and people who might have very, very strong religious beliefs, especially if they're involved in some of the stricter –

THE COURT: Okay.  Did I prevent you from asking this question: That is, you may hear information about my client that would indicate he had a relationship outside his marriage.  Would you based on that not be fair[?]  Did I prevent you from asking that question?

[DEFENSE COUNSEL]:  No, Your Honor.

We find no abuse of discretion by the trial court in this matter.  Although Rule 24(a) of the Tennessee Rules of Criminal Procedure provides that the trial court "shall permit questioning by the parties for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges[,]" the trial court, in its discretion, "controls the questions that can be asked to keep the voir dire within relevant bounds." Austin, 87 S.W.3d at 476 (adopting in appendix portions of opinion of this court).  As this court stated in Austin:

The right to question venire members is not unlimited, but must, of necessity, be limited to inquiries that are material and relevant to the specific case being tried. See generally Layman v. State, 1 Tenn. Crim. App. 83, 429 S.W.2d 832, 836 (1968). Generally, a trial court may properly limit inquiry into a venire member's religious beliefs in those instances where religious issues are expressly presented in the case, where a religious organization is a party to the litigation or where the inquiry is a

necessary predicate to the exercise of peremptory challenges. See generally Yarborough v. United States, 230 F.2d 56, 63 (4th Cir. 1956), cert. denied, 351 U.S. 969, 76 S. Ct. 1034, 100 L. Ed. 1487 (1956); Brandborg v. Lucas, 891 F. Supp. 352 (E.D. Tex. 1995); State v. Via, 146 Ariz. 108, 704 P.2d 238, 248 (1985), cert. denied, 475 U.S. 1048, 106 S. Ct. 1268, 89 L. Ed. 2d 577 (1986); Coleman v. United States, 379 A.2d 951, 954 (D.C. Ct. App. 1977); Rose v. Sheedy, 345 Mo. 610, 134 S.W.2d 18, 19 (1939); Corey Schriod Smith v. State, 797 So.2d 503 (Ala. Crim. App. 2000). Indeed,

> As to religion, our jury selection system was not designed to subject prospective jurors to a catechism of their tenets of faith, whether it be Catholic, Jewish, Protestant, or Mohammedan, or to force them to publicly declare themselves to be atheists. Indeed, many a juror might have a real doubt as to the particular religious category into which they could properly place themselves.

United States v. Barnes, 604 F.2d 121, 141 (2nd Cir. 1979), cert. denied, 446 U.S. 907, 100 S. Ct. 1833, 64 L. Ed. 2d 260 (1980).

Austin, 87 S.W.3d at 475-76. The defendant has failed to show how any questioning concerning potential jurors' memberships in religious or social organizations was relevant in this case as it had "no direct relationship to the parties involved in the matter or the issues presented." Id. at 476. Additionally, we have previously held that "[i]t is only where a defendant exhausts all of his peremptory challenges and is thereafter forced to accept an incompetent juror can a complaint about the jury selection process have merit." State v. Reid, 91 S.W.3d 247, 291 (Tenn. 2002) (citing State v. Coury, 697 S.w.2d 373, 379 (Tenn. Crim. App. 1985)). The fact that the defendant did not exercise all peremptory challenges would override any error on the part of the trial court. This issue is without merit.

### III. Prior Bad Acts

The defendant also asserts the trial court erred by allowing the State to ask a witness, without a jury-out hearing first, as to the defendant's "bad reputation and character."

This issue arose late in the trial when codefendant Francisco Bruno called his wife, Wanda Bruno, as a witness. During cross-examination, the State asked Mrs. Bruno whether she was aware that the defendant had a pregnant girlfriend in addition to being married. After the State asked several questions concerning the pregnant girlfriend and the witness's relationship with the defendant's wife, defense counsel argued that this information was not relevant:

[DEFENSE COUNSEL]: Your Honor, I would like to object to the relevance of all this questioning about Mrs. Bruno's knowing about the girlfriend and the wife and whether they socialize when they each know –

[THE STATE]: It has to go with her bias. If she's willing to cover up for [the defendant] then, she's willing to cover up for them now.

THE COURT: Well, it also goes to her credibility. And that is dishonesty in terms of the relationship and covering it up.

[DEFENSE COUNSEL]: It's prejudicial.

THE COURT: Well, it's probably more probative than prejudicial. The issue is credibility. And besides this isn't your witness. [Codefendant's counsel] put her on. And you're kind of stuck with it right now.

All right, General.

In his motion for new trial, the defendant asserted that the trial court erred "in overruling defense counsel's objection to the assistant district attorney's inflammatory and prejudicial questioning," but did not state a legal basis for the assertion. At the hearing on the motion, defense counsel argued "those type of questions were more prejudicial than probative" and noted that she had filed a motion in limine for a jury-out hearing:

And also in the motion in limine that I had filed I called for a jury-out hearing concerning any evidence of bad reputation to character. We would say this would have more to do with bad character. And so this did come out without a jury-out hearing and -- although you did find that it was more probative than prejudicial, we would submit that it was more prejudicial than probative.

However, on appeal, although not specifically citing Tennessee Rule of Evidence 404(b), the defendant argues the trial court erred in allowing the State in cross-examination to question Mrs. Bruno as to her knowledge of the defendant's affair. Although on appeal the defendant argues that this testimony was the kind which the defendant thought was a prior bad act subject to a jury-out hearing before the testimony, at trial the argument presented was that the prejudicial effect of the witness being asked as to her knowledge of the affair outweighed its probative value. Thus, the trial court was not asked by the defendant to determine, as is the case on appeal, whether Mrs. Bruno's knowledge of the affair was a "bad act."

We begin by noting that the jury heard testimony much earlier in the trial, before Wanda Bruno's testimony, that the defendant had a pregnant girlfriend, Adriana Montemayor, while also being married and had maintained two separate households. Specifically, Sergeant McWright testified, without objection, that the defendant told him he was maintaining two residences, one in Murfreesboro where his wife and children lived and one in Nashville which was the home of his pregnant girlfriend. Likewise, Officer Aaron Thomas, testifying as to the consensual search of the house the defendant maintained in Nashville, stated, again without objection, that the defendant had

said he had a girlfriend at that location. In fact, in her cross-examination of Officer Thomas, defense counsel questioned Officer Thomas extensively about the defendant's girlfriend and the residence they maintained, the vehicle she drove, and her employment at the defendant's restaurant. Further, she questioned Officer Thomas about the defendant's admission that he was paying the girlfriend's bills. The fact that the defense had not objected earlier in the trial to this same information results in a waiver of any complaint about the admission of such evidence. Tenn. R. App. P. 36(a); see also State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000) (citing State v. Harrington, 627 S.W.2d 345, 348 (Tenn. 1981)). "When a party does not object to the admissibility of evidence, . . . the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary[.]" Id.

## IV.  Sentencing

As a final issue, the defendant contends that the trial court erred in imposing an "excessively long" eleven-year sentence, especially since codefendant Melendez received only an eight-year sentence. He argues that the trial court failed to consider his "potential or lack of potential for rehabilitation or treatment" when it determined the length of his sentence and "gave an unreasonably high amount of weight" to his prior criminal history as an enhancement factor.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

At the sentencing hearing, the defendant testified that he was a resident alien and had been in the United States for thirteen years. He said his legitimate source of income before he was arrested was a restaurant of which he was a co-owner. His arrest and conviction had led to a drop in his children's grades and the deterioration of his daughter's health. He said he felt "very bad" about his conviction and the residual effects on his family. He asked that the trial court consider a suspended sentence because of his family and because he would "never do . . . the same thing again." If he were released into the community, he would follow "every rule" the court imposed and would get "some kind of job with air conditioning." On cross-examination, he admitted that the delivery for which he was arrested was the "fourth or fifth" time he had participated in the delivery of a large quantity of marijuana to Nashville. Asked if codefendant Melendez was "above" him in the marijuana selling enterprise, the defendant replied, "[Y]ou could say that"; however, he also testified that this delivery was the only one in which Melendez was physically present.

At the conclusion of the sentencing hearing, the court determined the defendant was a Range I, standard offender and applied the following enhancement factors to the sentence: (2), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and (3), the defendant was a leader in the commission of an offense involving two or more criminal actors. See Tenn. Code Ann. § 40-35-114(2), (3) (2003). The court also determined that one mitigating factor applied: (1), the defendant's criminal conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113(1) (2003). Relying on the statutory principles of sentencing, including considering the defendant's "potential for rehabilitation or treatment," the court imposed an eleven-year sentence and a $2,000 fine. Additionally, citing to State v. Hooper, 29 S.W.3d 1 (Tenn. 2000), the court refused to grant an alternative sentence and ordered confinement because "deterrence in this case is particularly suited to achieve the goal because these are leader incidents which are increasingly present in the community, his crime was the result of intentional, knowing or reckless conduct that was motivated by the desire to gain financial gain," as well as the fact that the defendant "was a member of a criminal enterprise and he substantially encouraged or assisted others in achieving the criminal objective and he had previously engaged in criminal conduct of the same type."

As a Range I, standard offender, the defendant was subject to a sentence ranging from eight to twelve years for his Class B felony conviction. See Tenn. Code Ann. § 40-35-112(a)(2) (2003). The presumptive sentence for a Class B felony is the minimum sentence in the range if there are no enhancement or mitigating factors. Id. § 40-35-210(c). Procedurally, the trial court is to enhance the sentence within the range based on any applicable enhancement factors, and then reduce the sentence within the range as appropriate based on any mitigating factors. Id. § 40-35-210(e). The weight to be afforded an enhancement or a mitigating factor is left to the trial court's discretion as long as the trial court complies with the purposes and principles of the 1989 Sentencing Act, and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

We conclude that the record fully supports the trial court's sentencing of the defendant. The presentence report showed that he was convicted of DUI in 2000 and of resisting arrest in 2002. He

admitted at his sentencing hearing that he had been involved in four or five large deliveries of marijuana, ranging from 60 to 140 pounds each, to the Nashville area. The trial court specifically stated that it was considering, *inter alia*, the defendant's potential for rehabilitation in determining his sentence. As to alternative sentencing, we note that, as a Class B felon, he was not automatically presumed to be a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6) (2003). Moreover, because he received an eleven-year sentence, he was not eligible for probation. See Tenn. Code Ann. § 40-35-303(a) (2003).

As to the application of the Hooper factors, we conclude the trial court acted reasonably in ordering confinement based partially upon deterrence grounds. In Hooper, our supreme court held that "trial courts should be given considerable latitude in determining whether a need for deterrence exists and whether incarceration appropriately addresses that need." 29 S.W.3d at 10. As a result, appellate courts should

> presume that a trial court's decision to incarcerate a defendant based on a need for deterrence is correct so long as any reasonable person looking at the entire record could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes.

Id. (footnote omitted).

Based on our *de novo* review, we find the trial court examined the deterrence factor in context in this case and assigned it such "'weight, credit and value as the circumstances warrant[ed].'" Id. (quoting State v. Michael, 629 S.W.2d 13, 15 (Tenn. 1982)). The record supports the court's determination that incarceration was appropriate for the defendant.[3]

Additionally, the defendant argues that he and codefendant Melendez received unjustified disparate sentences. We note, however, that while a stated goal of our sentencing act is the "fair and consistent treatment of all defendants by eliminating *unjustified disparity* in sentencing," Tenn. Code Ann. § 40-35-102(2) (emphasis added), nothing in our law prohibits differences in sentences among codefendants where a codefendant, while accountable as a principal, was not "tainted with that degree of guilt as was defendant." McGowen v. State, 221 Tenn. 442, 454, 427 S.W.2d 555, 560 (1968). Our sentencing code clearly supports an "individualized, case-specific inquiry to determine the range of sentence . . . ." State v. Greg Lee Sword, No. 03C01-9203-CR-00074, 1993 WL 100192, at *5 (Tenn. Crim. App. Mar. 31, 1993), perm. to appeal denied (Tenn. Aug. 2, 1993). In the present case, the trial court determined that codefendant Melendez did not have a prior criminal history and,

---

[3]Additionally, we note the similarities of the facts of the present case and those of Hooper, in which our supreme court concluded that incarceration was appropriate for a defendant who had transported illegal drugs to Tennessee on several occasions and his purpose for doing so was "to profit or gain from his illegal conduct." 29 S.W.3d at 12. Accordingly, the court determined that "the trial court could rationally conclude that some deterrence may be obtained by the appellee's incarceration based on this factor." Id. at 12-13.

according to the defendant, was only present for one of the marijuana deliveries. The court applied one enhancement factor to Melendez, that he was a leader in the commission of the present offense, and one mitigating factor, that the criminal conduct neither caused nor threatened serious bodily injury, and imposed an eight-year sentence, the minimum within the range, and a $10,000 fine. We conclude that the record supports the trial court's sentencing of the defendant.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the defendant's conviction and sentence.

                                                ALAN E. GLENN, JUDGE